Filed 7/26/13  P. v. Rodriguez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | E054701 |
| v. | (Super.Ct.No. INF065609) |
| CONCEPCION RODRIGUEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Defendant's appeal:  Judgment affirmed.  People's appeal:  Sentence vacated; remanded with instructions.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew

1

Mestman, Deputy Attorneys General; Paul E. Zellerbach, District Attorney, and Kelli Catlett, Deputy District Attorney, for Plaintiff and Appellant.

Defendant Concepcion Rodriguez appeals his conviction for first degree murder with the special circumstance of murder committed during the course of a kidnapping. We find no reversible error, and we will affirm the conviction.

The prosecution appeals from the sentence, contending that the trial court's decision to suspend the order for victim restitution rendered the sentence unauthorized. We agree. Further, we conclude that the imposition of a parole revocation fine was unauthorized. We will direct the trial court to take corrective action with respect to both sentencing issues.

PROCEDURAL HISTORY

Defendant was charged with the premeditated and deliberate murder of Anastacio Torres, including an allegation that the murder was committed during the commission or attempted commission of kidnapping. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(B).)[1] The information also alleged that defendant personally and intentionally discharged a firearm causing great bodily injury and death during the commission of count 1, within the meaning of section 12022.53, subdivision (d) and section 1192.7, subdivision (c)(8). During the trial, the information was amended to allege personal use of a firearm within the meaning of section 12022.5, subdivision (a).

---

[1] All statutory citations refer to the Penal Code unless another code is specified.

2

A jury found defendant guilty as charged on count 1 and found the kidnapping special circumstance true. The jury deadlocked on the two gun use allegations, and the allegations were later dismissed on motion of the People.

Defendant filed a motion for acquittal or new trial, and for an order imposing no restitution. The prosecution filed opposition. The court denied the motion for acquittal or new trial. It imposed the mandatory term of life imprisonment without the possibility of parole. It ordered victim restitution in the amount of $7,500 but ordered it stayed unless defendant was released on parole. The court imposed a restitution fine in the amount of $1,000 and imposed and stayed a parole revocation fine in the same amount.

Defendant filed a timely notice of appeal. The prosecution filed a timely notice of appeal from the order staying victim restitution.

FACTS

On the morning of May 14, 2006, the body of Anastacio Torres was found in a semi-secluded area of Desert Hot Springs. His hands were bound in front of him with plastic zip ties and his body lay on top of a mattress pad and a blanket. He had been shot twice in the chest.

In May 2006, a rumor began to circulate among a group of acquaintances that Torres, known as "Taquito," had raped Andrea Garcia, the girlfriend of defendant Rodriguez. On May 12, 2006, defendant repeatedly asked Garcia if the rumor was true. She denied it. During the course of that day and evening, defendant beat her, threatened her with a handgun, tied her wrists with zip ties, and put her into a closet in their apartment. He pointed the gun at her head and demanded to know if Torres had raped

3

her.  Afraid of being shot, Garcia finally told him that Torres had raped her, although in fact he had not done so.  After Garcia had confirmed that Torres had raped her, defendant cut off the zip ties and let her go.

On May 13, 2006, defendant and another man, later identified as Mingus Chavarria, went to the apartment in Desert Hot Springs where Torres lived with his girlfriend Amanda Valenzuela, her mother Michele Valenzuela, and Michele's husband, Franklin Vasquez.  Only Vasquez was at home when defendant and Chavarria arrived. Vasquez knew defendant but did not know Chavarria.  Defendant told Vasquez he was looking for Torres.  Vasquez told defendant that Torres was not home.  Defendant and Chavarria waited outside the apartment.  While they waited, defendant made "cuff-like" shapes out of zip ties he had in his pocket.  Although Vasquez did not perceive that defendant was angry or upset, Chavarria said that defendant appeared to be angry.[2] According to Chavarria, defendant had a gun in the waistband of his pants.

---

[2] Chavarria testified that he had accompanied defendant at defendant's request but did not know why defendant wanted to see Torres.  A woman Chavarria did not know drove them from defendant's apartment to Torres's apartment and waited for them in a nearby church parking lot.

Chavarria's description of the visit to the Valenzuela apartment differed greatly from Vasquez's testimony.  Vasquez said that the two men arrived around 10:15 to 10:30 in the evening and that he visited outside with defendant for about 45 minutes, until Torres and the others came home.  Chavarria testified that they arrived there early in the afternoon and that they waited outside, alone, for an hour or two before Torres and the others arrived.  He believed that Torres and the others arrived around sundown.

4

Around 10:30 or 11:00 p.m., Torres and Amanda and Michele Valenzuela returned to the apartment. Vasquez told Torres that defendant was downstairs and wanted to see him. Torres left the apartment and went to the laundry room where defendant and Chavarria were waiting for him.[3]

Inside the laundry room, defendant asked Torres why he had raped defendant's girlfriend. Torres said he did not do that. The two argued loudly.

Michele Valenzuela heard loud voices outside and went out to see what was going on. The voices were coming from the laundry room. From outside the laundry room, she heard Torres say, "Dude, if you are going to shoot me, then shoot me." Michele yelled out that they needed to take their "bullshit" elsewhere. At that point, defendant said to Chavarria, "Let's go." Chavarria left the laundry room and began walking toward the street. Defendant and Torres exited next. Michele Valenzuela saw defendant put his arm around Torres's shoulder and heard him say, "If you have nothing to hide, then come with me." Michele watched them walk up the street toward a church, and then returned to her apartment. Amanda Valenzuela also saw them walking toward the church. She described the three men walking abreast, with Torres in the middle.

---

[3] Michele Valenzuela testified that she saw Chavarria come out of the laundry room, followed by defendant and Torres. Chavarria denied having been in the laundry room and said that he waited outside.

When they arrived at the parking lot, where their driver awaited them, Chavarria saw that Torres's hands were bound with zip ties. Chavarria asked Torres what was going on. Torres said that what defendant was saying was not true. Defendant told Torres, "If you have nothing to hide, then you'll go with us." Torres got into the car, and they drove to defendant's apartment.

At the apartment, they went into a bedroom, where defendant began arguing with Torres, pacing and yelling at him. He accused Torres of raping Garcia, and Torres continued to deny it. Torres's hands were still zip-tied. Defendant told Chavarria to stay with Torres while he went to get Garcia.

Garcia was sleeping in defendant's mother's apartment in the same apartment building where she lived with defendant. Around 2:00 or 3:00 a.m., defendant woke her and asked her to come with him. She followed defendant to their apartment. There, she saw Torres kneeling on the floor in the middle of the bedroom with his hands bound behind him. There was another man in the room, or possibly two. Garcia did not know them. One or both men were standing next to Torres. At least one man other than defendant had a gun.[4]

Defendant, holding a handgun, asked Garcia whether Torres had raped her. He told her either she or Torres was going to be "getting it" if she did not tell the truth. Torres was crying, and begged Garcia to tell defendant the truth, i.e., that he didn't do it. Garcia, fearing for her life, apologized to Torres, but told defendant that Torres had raped her. Defendant then told her to leave.

_____

[4] Chavarria denied having a gun.

Garcia returned to defendant's mother's apartment and went to sleep. She did not call the police or alert defendant's brother, Adam, who lived in the same building. She did not hear any gunshots.

After Garcia left the apartment, Chavarria pleaded with Torres to tell defendant what he wanted to know, but Torres did not. Defendant turned on some loud music and shot Torres in the chest. Torres staggered and fell.

Defendant, Chavarria and the unknown female drove to a house belonging to someone named Irma. A friend named Turtle was also at the house. Irma then drove defendant, Chavarria and Turtle back to defendant's apartment in her pickup truck. Defendant, Chavarria and Turtle placed Torres's body in the back of the truck and covered him with two blankets Chavarria got from a neighboring apartment. Defendant then told Chavarria to dispose of the body.

Chavarria drove the truck two or three blocks before running out of gas. He walked back to the apartment and told defendant what had happened. He and defendant walked to a gas station, got some gas and put it into the truck, then drove to the location where Torres's body was found. Defendant told Chavarria to get the body out of the truck. Chavarria pushed the body out of the truck with his feet and covered it with the blankets. He and defendant then returned to the apartment. Chavarria washed out the truck bed with a hose.

Defendant was interviewed in connection with Torres's murder on July 7, 2006. He denied killing Torres, but admitted that they had talked in the laundry room about Torres's having sex with Garcia. He said they left together and walked toward the

7

church, then parted amicably. Police contacted Garcia, and she provided an alibi. No one could identify defendant's accomplice at that point, and the district attorney declined to file charges.[5]

In December 2008, Michele Valenzuela identified a photograph of Chavarria as possibly being the person who was with defendant on May 13, 2006. In March 2009, police interviewed Chavarria at the county jail in Indio, where he was in custody on a different matter. Chavarria admitted his involvement. Police later contacted Andrea Garcia, who was then living in Los Angeles County. Charges were then filed against defendant and Chavarria. Chavarria later pleaded guilty to second degree murder and received a sentence of 15 years to life in exchange for truthful testimony.

---

[5] Defendant's brother Adam and Adam's girlfriend Mary Valenzuela told police that defendant had been with "Mingus" on the night of the murder. Adam said that Mingus resembled Carlos Cortez, whom Frank Vasquez had identified as possibly being the person defendant was with at his apartment that night. Cortez, however, had a solid alibi. None of the other witnesses knew Chavarria and police were unable to pursue the investigation at that time. Police later learned that a Mingus Chavarria was in custody.

DEFENDANT'S APPEAL

LEGAL ANALYSIS

1.

THE TRIAL COURT PROPERLY DENIED THE MOTION FOR ACQUITTAL

At the conclusion of the prosecution's case-in-chief, defendant made a motion for acquittal pursuant to section 1118.1 with respect to the kidnapping special circumstance and the felony-murder theory of murder during the commission of a kidnapping. He contended that there was no substantial evidence to corroborate the testimony of Mingus Chavarria, who was an accomplice as a matter of law. The trial court denied the motion after finding that Torres's statement, "Dude, if you are going to shoot me, then shoot me," was sufficient proof to establish "the fact that the defendant had a gun pointed at the victim," that the victim was "threatened with a firearm," and that the threat with the gun made Torres's movement without consent because "[n]ow he's leaving with the person who is threatening him."

Defendant now contends that although the trial court correctly assessed the evidence without regard to Chavarria's testimony, it erroneously relied on Torres's statement as evidence of the victim's state of mind to prove defendant's conduct. He also contends that if Torres's statement had been excluded or "properly limited," there would have been insufficient corroboration of the testimony of the accomplice, Chavarria. In a related argument, he contends that the court erroneously allowed the jury to consider Torres's statement as proof of the matter asserted, i.e., that defendant possessed and

9

displayed a gun in the laundry room. We will address the admissibility of the statement before considering whether the motion for acquittal should have been granted.

*Torres's Statement Was Admissible As Circumstantial Evidence That Torres Did Not Go Willingly with Defendant.*

During motions in limine, the trial court initially ruled that Torres's laundry room statement was admissible for the nonhearsay purpose of showing the effect of the statement on the listener, Michele Valenzuela, i.e., to explain her subsequent conduct. The court ruled that the statement would not be admissible "for the truth of the matter asserted." The court did not specify what matter was asserted in the statement, "Dude, if you are going to shoot me, then shoot me." Later, the prosecution sought to have the statement admitted under Evidence Code section 1250, subdivision (a)(2), to explain Torres's subsequent conduct, i.e., that he did not leave with defendant voluntarily but because defendant had a gun (or because Torres thought he did). Over defendant's objection, the court revised its prior ruling to allow the prosecutor to introduce the statement for the "truth of the matter asserted."

In his closing argument, the prosecutor relied on the statement as evidence that Torres did not go willingly with defendant and Chavarria but went out of fear because defendant had displayed a gun.

Evidence of a murder victim's state of mind may be admissible under the hearsay exception provided in Evidence Code section 1250 or as nonhearsay circumstantial evidence of the victim's state of mind:

10

"[Evidence Code] [s]ection 1250 provides in relevant part that '. . . evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan . . .) is not made inadmissible by the hearsay rule when:  [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant.' The evidence admitted under section 1250 is hearsay; it describes a mental or physical condition, intent, plan, or motive and is received for the truth of the matter stated. [Citation.]  If offered to prove the declarant's state of mind, the statement may be introduced without limitation, subject only to section 352.  However, the declarant's state of mind must be at issue in the case.  For instance, evidence of the victim's general fear or dislike of the appellant is not relevant unless the victim's state of mind has been placed in issue.  [Citation.]

"In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay.  It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind. [Citation.]  Again, such evidence must be relevant to be admissible—the declarant's state of mind must be in issue.  [Citation.]  [Upon request,] [a] limiting instruction is required with declarations used as circumstantial evidence of the declarant's mental state; that is, the declaration is not received for the truth of the matter stated and can only be used for

11

the limited purpose for which it is offered. [Citation]." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389; accord, *People v. Cox* (2003) 30 Cal.4th 916, 962-963.)[6]

Here, Torres's statement did not directly declare a mental state, such as "I am afraid that Rodriguez is going to kill me." Consequently, it was not admissible under Evidence Code section 1250. Rather, it was nonhearsay circumstantial evidence of his state of mind, i.e., that he was afraid that defendant was going to shoot him, either because defendant had displayed a gun or because Torres for some other reason believed defendant had a gun. It was also circumstantial evidence that Torres accompanied defendant and Chavarria out of fear that defendant would shoot him. Accordingly, it was admissible for that purpose.

Defendant contends, however, that even if the evidence was admissible, the court should have excluded it under Evidence Code section 352.[7] He contends that the probative value as to Torres's state of mind and whether Torres voluntarily accompanied defendant to defendant's apartment was substantially outweighed by the probability that the jury would improperly use the evidence of Torres's statement as proof of *defendant's* mental state and conduct. He asserts that in his closing arguments, the prosecutor relied

---

[6] Evidence Code section 355 provides: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." Here, defendant did not request a limiting instruction.

[7] Defendant also contends that it should have been excluded under Evidence Code section 1252. That statute provides that evidence which would otherwise be admissible under Evidence Code section 1250 is inadmissible if it was made under circumstances which indicate its lack of trustworthiness. Because we have concluded that the evidence was not admissible under the hearsay exception provided for in Evidence Code section 1250 but was instead admissible as nonhearsay, we need not address this contention.

12

on Torres's statement "at least five separate times" in arguing for a felony-murder conviction on the kidnapping theory.

Evidence Code section 352 accords the trial court broad discretion to exclude even relevant evidence "'if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] We review a trial court's ruling under Evidence Code section 352 for an abuse of discretion." (*People v. Clark* (2011) 52 Cal.4th 856, 893.)

Here, defendant objected to the evidence of Torres's statement under Evidence Code section 352. The trial court's implied finding that the probative value of the statement outweighed its potential for prejudice was not an abuse of discretion. Torres's state of mind when he left the laundry room with defendant—whether he went willingly or because of force or fear—was a significant issue for purposes of the felony-murder theory that he was murdered during a kidnapping and for the kidnapping special circumstance, and his statement was highly probative on that point. However, it was not the only evidence that defendant had a gun—Chavarria testified that defendant had a gun in his waistband before he and Torres went into the laundry room. Consequently, the likelihood that the jury would misuse Torres's statement as evidence of defendant's mental state or conduct, rather than as circumstantial evidence of Torres's mental state or

as an explanation of his conduct, was minimal. Accordingly, the trial court did not abuse its discretion in ruling on defendant's objection pursuant to Evidence Code section 352.

*The Motion for Acquittal.*

"On a motion for judgment of acquittal under section 1118.1, the trial court applies the same standard as an appellate court reviewing the sufficiency of the evidence. The court must consider whether there is any substantial evidence of the existence of each element of the offense charged, sufficient for a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1286.) Whether substantial evidence exists is a question of law which a reviewing court decides independently. (*Ibid.*) Accordingly, we do not address the correctness of the trial court's analysis of the evidence.

Accomplice testimony is not sufficient to support a conviction unless it is corroborated by other evidence connecting the defendant with the offense without aid or assistance from the accomplice's testimony. (§ 1111; *People v. Avila* (2006) 38 Cal.4th 491, 562-563.) Corroborating evidence is sufficient if it "tends to implicate the defendant and thus relates to some act or fact that is an element of the crime." (*People v. Avila*, at pp. 562-563) The corroborative evidence may be "'"slight and entitled to little consideration when standing alone." [Citation.]'" (*Id.* at p. 563.) "It is enough that the corroborative evidence tends to connect defendant with the crime in a way that may reasonably satisfy a jury that the accomplice is telling the truth. [Citation.]" (*People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303.) Corroborative evidence may be entirely circumstantial. (*Ibid.*)

As discussed above, Michele Valenzuela's testimony that Torres said, "Dude, if you are going to shoot me, then shoot me," was admissible as circumstantial evidence that Torres did not voluntarily leave the apartment complex with defendant. That evidence was also sufficient to corroborate Chavarria's testimony that defendant had a gun. Defendant's admission that the night before Torres's body was found, he confronted Torres about the rumors that Torres had raped Garcia, also corroborated Chavarria's testimony, as did Michele Valenzuela's testimony that defendant and Torres were talking in "very loud" voices. Additionally, Amanda Valenzuela saw the three men walking away from the apartment complex three abreast, with Torres in the middle, thus implying that Torres did not go willingly. Taken all together, this evidence supports the inference that Torres did not leave the apartment complex with defendant voluntarily.

Defendant contends that Michele Valenzuela's further testimony that moments later she saw defendant put his arm around Torres's shoulder and heard him say, "If you have nothing to hide, then come with me," and that defendant's hands were not bound shows that defendant did not kidnap Torres. The existence of conflicting evidence does not, however, affect our substantial evidence analysis. In assessing whether substantial evidence exists, an appellate court views all factual matters in the light most favorable to the prevailing party and resolves all conflicts in the evidence and indulges all reasonable inferences from the evidence to support the judgment. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trier of fact

15

might have reached a different result if it had believed other evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

Because substantial evidence corroborated Chavarria's testimony and supported the kidnapping special circumstance and the kidnapping felony-murder theory, the trial court properly denied the motion for acquittal.

2.

THE TRIAL COURT DID NOT ERR BY FAILING TO DISMISS THE MURDER CHARGE ON ITS OWN MOTION

Defendant contends that although he did not seek acquittal of murder on theories of express or implied malice, the trial court should nevertheless have dismissed the murder charge in its entirety because the accomplice's testimony was the only direct evidence linking defendant to the killing.

Section 1118.1 provides that before the case is submitted to the jury, either on motion of the defendant or on its own motion, the trial court must order entry of a judgment of acquittal as to any offense charged in the accusatory pleading if the evidence is insufficient to sustain a conviction on the offense or offenses on appeal.

Here, there is ample circumstantial evidence linking defendant to the killing, independent of Chavarria's testimony. Defendant admitted that he confronted Torres about the rumor that Torres had raped defendant's girlfriend, Andrea Garcia. The confrontation in the laundry room, which was overheard by Michele Valenzuela, took place late in the evening on May 13, 2006. Andrea Garcia testified that around 2:00 or 3:00 a.m. on May 13, 2006, defendant took her to their apartment where Torres, with his

16

hands bound and on his knees, begged her to tell defendant the truth, while defendant stood nearby, holding a handgun.  Torres's body, with two bullet wounds and his hands bound, was found on the morning of May 14, 2006.  That evidence, which is in itself sufficient to support the inference that defendant shot and killed Torres, is also sufficient to corroborate Chavarria's testimony.[8]  (*People v. Avila*, *supra*, 38 Cal.4th 562-563 [corroborating evidence is sufficient if it is independent of the accomplice's testimony and "tends to implicate the defendant and thus relates to some act or fact that is an element of the crime"].)  Accordingly, the trial court did not err in failing to order acquittal on the murder charge.

3.

THE EVIDENCE DID NOT MANDATE AN INSTRUCTION THAT<br>ANDREA GARCIA WAS AN ACCOMPLICE

Defendant makes three separate arguments based on the premise that Andrea Garcia was an accomplice:  In Argument III, he contends that the murder charge should have been dismissed because Garcia was an accomplice whose testimony was not corroborated and whose testimony could not corroborate Chavarria's; in Argument VIII, he contends that the trial court prejudicially erred by failing to instruct the jury that Garcia was an accomplice; and in Argument IX, he contends that the trial court's failure to so instruct violated his right to due process.  We reject all three contentions because

---

[8] In section 3, we reject defendant's contention that Garcia was an accomplice whose testimony also required corroboration.  We note, however, that the circumstantial evidence discussed above is sufficient to corroborate Chavarria's testimony, even without Garcia's testimony.

17

the evidence does not show that Garcia was an accomplice as a matter of law, and the evidence did not warrant an instruction directing the jury to determine whether she was an accomplice.

*Garcia Was Not an Accomplice As a Matter of Law.*

Section 1111 defines "accomplice" as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." An accomplice may be a direct perpetrator or an aider and abettor. (*People v. Avila*, *supra*, 38 Cal.4th at p. 564.) Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn from the facts. (*People v. Fauber* (1992) 2 Cal.4th 792, 834.) Stated another way, a person is an accomplice as a matter of law only if the evidence is uncontested and unequivocal. (*People v. Williams* (2008) 43 Cal.4th 584, 637.) The burden is on the defendant to prove by a preponderance of the evidence that a witness is an accomplice.[9] (*People v. Fauber*, at p. 834.)

Defendant contends that Garcia was an accomplice under either the theory that she was a direct participant in the murder or the theory that she was an aider and abettor.

---

[9] We reject defendant's contention that there are two separate tests for determining whether a witness is an accomplice. His so-called probable cause test—that a person is an accomplice if he or she can be indicted for the crime charged—merely states the threshold for determining accomplice status: By definition, if the witness cannot be charged with the same offense, he or she is not an accomplice. (§ 1111.) If, however, the witness could be charged with the same offense, he or she is an accomplice as a matter of law only if undisputed facts from which only a single inference can be drawn show that the witness is necessarily guilty of the charged offense. Otherwise, the witness's status as an accomplice is a question of fact to be decided by the jury. (*People v. Fauber*, *supra*, 2 Cal.4th at p. 834; *People v. Williams*, *supra*, 43 Cal.4th at p. 637.)

18

Both theories depend on defendant's contention that Garcia lied about Torres having raped her, knowing that defendant would either murder Torres in revenge or assault him with a firearm, with murder being a foreseeable consequence of the assault.

Defendant did not seek a ruling that Garcia was an accomplice as a matter of law, nor did he request an instruction to the jury to determine whether Garcia was an accomplice. In general, errors not asserted in the trial court may not be raised for the first time on appeal. (See, generally, *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.) Assuming, however, that review of defendant's claim is not forfeited by his failure to raise it below, he has failed to meet his burden of demonstrating error.

Although defendant repeatedly asserts that Garcia "knew" that defendant would kill or assault Torres, he does not cite to any evidence in the record which shows that Garcia knew what defendant would do. The only evidence he refers to, and the only evidence of which we are aware, is Garcia's testimony that when defendant brought her to the apartment where Torres was being held, he told her that unless she told the truth about being raped by Torres, "it was either going to be me getting it or [Torres] getting it." This statement is ambiguous, to say the least, and it clearly does not mandate the conclusion that Garcia "knew" that if she told defendant Torres had raped her, defendant would kill Torres.

Furthermore, under either of defendant's theories of Garcia's accomplice status, it is essential that there be unequivocal and undisputed evidence that Garcia acted with the intent to further defendant's criminal purpose. As an aider and abettor, Garcia's vicarious liability depended on her acting ""with knowledge of the criminal purpose of

19

the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.]'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) Where the evidence concerning the witness's intent is disputed or where it supports more than one inference concerning the witness's intent, the witness is not an accomplice as a matter of law. (*People v. Williams*, *supra*, 43 Cal.4th at p. 637.)

Defendant does not cite any evidence which demonstrates that Garcia intended to further defendant's criminal purpose, and we have found none. Rather, the evidence shows that Garcia's only intention was to avoid being harmed herself. She testified that when defendant demanded that she tell the truth or else it would be either her or Torres "getting it," she rebuffed Torres's plea that she tell defendant that he did not rape her and lied to defendant because she was afraid of what defendant would do to *her* if she did not. Her fear was based on her experience of the day before, when defendant beat and harangued her all day, eventually binding her wrists and confining her in a closet and threatening her at gunpoint that he would kill her if she did not admit that Torres had raped her. There was no evidence to the contrary, and there is simply no factual basis upon which to base an inference that, contrary to her testimony, Garcia really intended for defendant to assault or murder Torres. Any such inference would be based on nothing more than speculation. Speculation, of course, is not a sufficient basis for any inference. (*People v. Hughes* (2002) 27 Cal.4th 287, 365.) Accordingly, Garcia's testimony does not support a finding that she was an accomplice under an aiding and abetting theory. (*People v. Williams*, *supra*, 43 Cal.4th at p. 637.)

20

Defendant's so-called "Othello" theory—that Garcia lied about Torres having raped her in order to goad defendant into killing Torres—also required evidence that Garcia lied with the intention of bringing about Torres's murder. (See *People v. McCoy*, *supra*, 25 Cal.4th at pp. 1121-1122.)[10] Again, there is no such evidence, and any conclusion that she did act with that intention would be pure speculation.

*The Evidence Also Does Not Warrant an Instruction Directing the Jury to Determine Whether Garcia Was an Accomplice.*

A trial court has a sua sponte duty to instruct the jury to determine whether the witness is an accomplice whenever trial testimony is sufficient to warrant the conclusion that a witness implicating the defendant is an accomplice. (*People v. Richardson* (2008) 43 Cal.4th 959, 1024.) Here, defendant contends only that Garcia was an accomplice as a matter of law and that the trial court had a sua sponte duty to so instruct the jury. He does not contend that the evidence warranted an instruction to the jury to determine whether Garcia was an accomplice. Accordingly, we need not address that issue. We note, however, that the evidence is not sufficient to warrant that conclusion, for the reasons stated above.

---

[10] In *People v. McCoy*, *supra*, 25 Cal.4th 1111, the issue before the court was whether a defendant charged as an aider and abettor can be convicted of a greater offense than the direct perpetrator. To illustrate the distinction between aider and abettor liability and direct liability, the court explained that if Iago falsely tells Othello that Desdemona is having an affair, hoping that Othello will kill her in a fit of jealousy, and Othello does so without further involvement by Iago, Iago's criminal liability is not vicarious, i.e., depending on Othello's mens rea, but rather is direct, depending solely upon his own mens rea. Accordingly, even if Othello is convicted only of voluntary manslaughter on a theory of provocation, Iago can be convicted of first degree murder. (*Id.* at pp. 1121-1122.)

21

4.

*APPRENDI* ISSUE

Defendant contends that the rule that corroboration for accomplice testimony need only be "slight" (see *People v. Avila*, *supra*, 38 Cal.4th at p. 536, discussed in Section 3, *ante*) violates his federal constitutional right to have all facts necessary for conviction and for increased punishment proven beyond a reasonable doubt, under the holding of *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*). He contends that corroboration of accomplice testimony is "akin" to an element of the offense and is thus subject to the *Apprendi* rule.

In *Apprendi* and subsequent decisions, the United States Supreme Court held that any fact, other than the fact of a prior conviction, which increases the penalty for a crime beyond the statutory maximum, must be submitted to the jury and must be proven beyond a reasonable doubt. (*People v. Nguyen* (2009) 46 Cal.4th 1007, 1010.) In *Apprendi*, the court "found this principle inherent in the common law tradition, in effect when the Sixth Amendment was adopted, that any fact crucial to the maximum punishment for an offense was, for that purpose, an 'element' of the offense, and thus equally subject to the requirements of indictment or presentment, proof beyond reasonable doubt, and jury trial." (*Ibid.*)

Although defendant contends that corroboration of accomplice testimony is tantamount to an element of the offense, he provides no authority or persuasive argument that this is so. Indeed, in *People v. Frye* (1998) 18 Cal.4th 894, our Supreme Court rejected such a contention. "Defendant's characterization of the accomplice corroboration

22

requirement as an element of the crime subject to proof beyond a reasonable doubt [citations] is unsupported and unpersuasive." (*Id*. at p. 966.)  Instead, the court characterized the corroboration requirement as a "collateral factual issue" which has no bearing on the substantive guilt or innocence of the accused or on any element of the charged offense.  (*Id*. at pp. 967-969.)

Similarly, defendant fails to persuade us that corroboration of accomplice testimony is a fact which subjects a defendant to increased punishment, thus bringing it within the *Apprendi* line of cases.  It is not.  The punishment remains the same, whether the defendant is convicted by corroborated accomplice testimony or by other evidence. Accordingly, the rule that "slight" evidence suffices to corroborate the testimony of an accomplice does not violate the federal Constitution.

5.

DEFENDANT FAILS TO DEMONSTRATE THAT THERE IS

INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION

AND SPECIAL CIRCUMSTANCE FINDING

Defendant contends that even if the accomplice testimony was corroborated, the evidence is nevertheless insufficient to support the conviction and special circumstance finding.

We presume that an order or judgment is supported by the evidence, and it is the appellant's burden to show that it is not.  (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  "'A party who challenges the sufficiency of the evidence to support a particular finding must summarize the evidence on that point, favorable and unfavorable,

23

and show how and why it is insufficient.'" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738, italics omitted.) It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence: An appellate court is not required to conduct an independent search of the record to determine the sufficiency of the evidence. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) Consequently, an appellant who fails to state the facts fairly forfeits evidentiary claims. (*Foreman & Clark Corp. v. Fallon*, at p. 881.) Here, defendant discusses only the evidence which, if believed, might undermine the verdict and finding. Accordingly, we need not address his contention, and we decline to do so.

6.

## OTHER CRIMES OR PRIOR BAD ACTS EVIDENCE CONCERNING

## ANDREA GARCIA WAS PROPERLY ADMITTED

Prior to trial, the prosecution sought admission pursuant to Evidence Code section 1101, subdivision (b), of two items of evidence: an incident of domestic violence between defendant and Garcia which took place in March 2006, about two months before the murder; and the incident on May 12, 2006, when defendant assaulted Garcia with a handgun, tied her hands with zip ties, and threatened to kill her if she did not admit that Torres had raped her. Over defense objection, the trial court ruled that both incidents were admissible. It instructed the jury using CALCRIM No. 375, the standard instruction on evidence admitted under Evidence Code section 1101, subdivision (b) (hereafter section 1101(b)).

24

Defendant now contends that the trial court erred in admitting the evidence of both incidents. (Arguments VI and VII.)

"'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. [Citation.] When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]' [Citation.] "'We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668.)

*The May 12 Assault on Garcia.*

Defendant contends that the trial court abused its discretion in admitting the May 12 incident involving Garcia on the issues of perpetrator identity and common plan or scheme. At trial, however, he objected to the evidence solely on two grounds: first, that because Garcia lacked credibility, the prosecution could not prove by a preponderance of the evidence that the incident occurred; and second, on grounds of

25

undue prejudice under Evidence Code section 352. The court rejected the first argument, stating that the witness's credibility was for the jury to decide. As to the second, the court held that the evidence "that the day before or two days before the homicide the defendant uses the same technique—zip ties, gun to the head, threats—is highly probative and it outweighs the prejudicial effect." Defense counsel did not disagree that the evidence was relevant under section 1101(b). Rather, she argued only that it was so prejudicial as to outweigh its probative value, in that "[o]nce the jury believes that [defendant] has had zip ties in the past . . . that's an automatic conviction."[11]

---

[11] In his opening brief, defendant notes that the jury was instructed that it could consider the evidence of an unspecified incident that occurred between defendant and Garcia solely on the issues of defendant's identity as the perpetrator in this case and whether or not he had a common plan or scheme. He then contends that none of the circumstances of the prior incident, including the use of zip ties, is sufficiently distinctive to qualify as evidence of identity under section 1101(b), nor are the common features of the prior incident and the homicide sufficient to give rise to an inference of a common plan or scheme.

Because defendant did not object on either ground below, neither contention is cognizable: Under California law, an error in admitting evidence may not be the basis for reversing a judgment or setting aside a verdict unless "an objection to or a motion to exclude or to strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a).) "'In accordance with this statute, we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. [Citations.]' [Citation.] Although no 'particular form of objection' is required, the objection must 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 354.)

26

"Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.] [¶] . . . [T]o be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citations.]'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) Nevertheless, a trial court has broad discretion in determining whether evidence should be excluded under Evidence Code section 352. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) A decision will not be reversed merely because reasonable people might disagree, and an appellate court is not authorized to substitute its judgment for that of the trial court. An exercise of discretion "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue'" must be upheld on appeal. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978.) On appeal, the burden is on the appellant to show clearly how the ruling was an abuse of discretion. (*Ibid.*)

Defendant argues that the May 12 incident was inflammatory because it "branded [him] a dangerous criminal predisposed to committing violent crimes." He argues that it was especially inflammatory because the victim was his pregnant "common law wife" and the incident involved a threat not only to her but also to his unborn child. However, because prior crimes evidence is inherently inflammatory and prejudicial (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404), to say that this evidence was inflammatory does not amount to a reasoned argument as to why it was an abuse of discretion to admit it.

27

Under Evidence Code section 352, "prejudice" applies to evidence which """"uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*."""" (*People v. Gionis*, *supra*, 9 Cal.4th at p. 1214.) Here, the May 12 incident had a significant effect on the issues in part because Garcia's testimony served to corroborate the testimony of Chavarria. As an accomplice who got a deal for testifying, Chavarria's credibility was questionable.

Garcia's description of defendant's abuse of her on the morning before the killing, if believed, corroborated Chavarria's testimony that defendant was angry while they were waiting for Torres and also supports the prosecution's theory that defendant did not kill Torres on the spur of the moment but rather as part of a premeditated scheme. Garcia's testimony was also significant because it showed that despite defendant's statement to the police that he was not angry at Torres because of the rumor, defendant most certainly was not "over" the rumors that Torres had raped Garcia. Because the May 12 incident with Garcia had significant probative value, it was not an abuse of discretion to admit it.

*The March 2006 Domestic Violence Incident.*

Garcia testified that in March 2006, defendant questioned her about a rumor that she had had sex with his friend, Gordi. Defendant beat her up, using a gun to beat her. Garcia reported the incident to police.

The prosecutor sought permission to elicit testimony from Garcia concerning that incident if, during cross-examination, the defense sought to discredit Garcia because of discrepancies between her trial testimony and statements she made to police in May 2006 or between her statements to police in 2009 and her statements in 2006. The prosecutor

28

argued that the evidence was admissible to explain that Garcia was afraid of defendant because of the domestic violence incident in March 2006 and was therefore not willing to tell the police what had actually happened on May 13, 2006. Defense counsel objected that under section 1101(b) the facts of the prior incident were too dissimilar to be probative, and argued that her research had failed to disclose any cases which hold that evidence of prior domestic violence could be introduced involving a witness who was not the victim in the current case. The court ruled that if the defense cross-examined Garcia about her inconsistent statements, the prior domestic violence evidence was admissible for the purpose of explaining why her statements were inconsistent.

Rather than waiting for cross-examination about Garcia's inconsistent statements, the prosecutor questioned Garcia on direct examination about the March 2006 domestic violence incident. The defense did not object or request a limiting instruction.

Defendant now contends that the trial court abused its discretion in admitting the evidence and not giving a limiting instruction.

There was no abuse of discretion in ruling the March 2006 domestic violence incident was admissible for the purpose stated by the court, i.e., to explain that Garcia's fear of defendant caused her to make false statements, giving defendant an alibi and failing to tell the police what she saw on the night of May 13, when she was questioned in 2006 about Torres's murder. Evidence of prior crimes or acts of misconduct is admissible when it is relevant to prove some material fact at issue, other than the defendant's propensity to commit crimes. (§ 1101(b).) The material facts referred to in

29

section 1101(b) are not limited to the specific facts enumerated in the statute. Rather, the facts at issue may include the state of mind of a witness or victim.

In *People v. Solis* (1985) 172 Cal.App.3d 877, a prosecution for rape, the defendant asserted that the alleged victim had consented to sexual intercourse with him. The court held that evidence of prior acts of violence committed by the defendant was admissible because the victim's knowledge of those incidents was relevant to determining whether she freely consented or consented out of fear of the defendant. (*Id*. at pp. 881, 885-886.) Here, as the trial court concluded, the domestic violence evidence was relevant to explain Garcia's 2006 statements to the police and was relevant to her credibility. And, for the reasons stated above, there was no abuse of discretion under Evidence Code section 352 in finding the evidence more probative than prejudicial.

Defendant also contends that the trial court's failure to give a limiting instruction on the use of the 1101(b) evidence was prejudicial error. The record does not show that the defendant requested any limiting instruction beyond that which is contained in

CALCRIM No. 375.[12]  In the absence of a request, a trial court is not required to give a limiting instruction on the use of section 1101(b) evidence.  (*People v. Maury* (2003) 30 Cal.4th 342, 397, fn. 11.)

Defendant contends that during the conference on jury instructions, the trial court "reaffirmed its ruling and concluded there was no need for an Evidence Code 1101 limiting instruction."  This appears to imply that he requested a limiting instruction, which the court refused.  The record refutes this.  During the conference, the court affirmed its ruling that the March 2006 domestic violence incident was admissible to explain why Garcia might not have wanted to be truthful with the police when she was questioned in 2006.  The court went on to state that the incident was "[not] necessarily 1101(b) evidence," although "some paragraphs" of the standard instruction on the use of

---

[12]  As given in this case, CALCRIM No. 375 states:

"Evidence was introduced regarding an incident that occurred between Andrea Garcia and the defendant, Mr. Rodriguez.  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"The defendant was the person who committed the offense alleged in this case or

"The defendant had a plan or scheme to commit the offense alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and the charged offense.

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder.  The People must still prove the charge and allegations beyond a reasonable doubt."

31

Evidence Code section 1101(b) evidence might apply. However, upon the request of defense counsel for additional time to review the instruction, the court agreed that further discussion as to the instruction would occur later. The court did *not* conclude at that time that there was no need for a limiting instruction.

As far as we are aware, there is no further discussion on the record concerning the instruction, and we have not found either a request by the defense for any further limiting instruction beyond that found in the standard instruction, or for a pinpoint instruction explaining the particular issue as to which the domestic violence incident was relevant. Clarifying instructions or pinpoint instructions are required, if at all, only upon request. (*People v. Estrada* (1995) 11 Cal.4th 568, 581; *People v. Hughes*, *supra*, 27 Cal.4th at p. 361.) Accordingly, the omission of any further limiting instruction was not error.

7.

KIDNAPPING INSTRUCTION

Defendant contends that the kidnapping instruction given to the jury "incorrectly defined the crime, confused the doctrines of 'fear' and 'consent,' and permitted the jury to erroneously conclude that kidnapping may be based solely on 'verbal coercion.'" (Arguments XI and XII.)

Defendant did not challenge the kidnapping instruction in the trial court. However, a defendant may assert instructional error on appeal if the error affected his or her substantial rights. (§ 1259.) We review claims of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

32

*Any Error in the Kidnapping Instruction with Respect to Force Was Not*

*Prejudicial*.

Using CALCRIM No. 1215, the court defined the elements of kidnapping in the following terms: "1. The defendant took, held, or detained another person by using force or by instilling reasonable fear; [¶] 2. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] AND [¶] 3. The other person did not consent to the movement." Section 207, subdivision (a), however, provides: "Every person who forcibly, *or by any other means of instilling fear*, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state or county, or into another part of the same county, is guilty of kidnapping." (Italics added.) Defendant contends that the kidnapping instruction improperly disassociates force from fear and permits a conviction based on a finding that the defendant used force alone to compel the victim's movement. He cites *In re Michele D.* (2002) 29 Cal.4th 600 and *People v. Majors* (2004) 33 Cal.4th 321 for the proposition that if the alleged victim is capable of consenting to movement and of resisting force, it is necessary to show that the defendant used force as a means of instilling fear.

In *In re Michele D.*, *supra*, 29 Cal.4th 600, the court held that although the language of section 207, subdivision (a) implies that "something more than the quantum of physical force necessary to effect movement of the victim from one location to another," namely fear, is generally required for a conviction for kidnapping, in the case of an infant or a child who is too young to give or withhold consent, it is sufficient if the

33

child is asported for an improper purpose.[13] (*Id.* at pp. 606-609.) Similarly, in *People v. Majors*, *supra*, 33 Cal.4th 321, the court held that since the 1990 amendment which added the phrase "'or by any other means of instilling fear,'" the concepts of force and fear are intertwined in section 207, subdivision (a), and implied, at least, that force which is not objectively sufficient to instill fear does not suffice. (*Id.* at pp. 326-327, 331.) Consequently, by stating that kidnapping may be committed by "force or fear" rather than "'by force or by any other means of instilling fear,'" CALCRIM No. 1215 is incorrect.

Nevertheless, the error does not require reversal. An instructional error that relieves the prosecution of the burden of proving beyond a reasonable doubt each essential element of the charged offense, or that improperly describes or omits an element of an offense, violates the defendant's rights under both the United States and California Constitutions, and is subject to review under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829.) Under *Chapman*, reversal is required unless the reviewing court can say beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*, at p. 24.)

Here, Chavarria testified that defendant had a revolver and that when defendant and Torres arrived at the church parking lot, Torres's hands were bound with zip ties. This is a circumstance which would cause an objectively reasonable fear of bodily harm, and a juror who believed Chavarria's testimony would not have found otherwise. Moreover, there was no evidence that defendant caused Torres to accompany him by

---

[13] "The conjoining of force with fear in section 207—'[e]very person who forcibly, or by any other means of instilling fear'—suggests as much." (*In re Michele D., supra*, 29 Cal.4th at p. 606.)

34

means of force which was *not* objectively sufficient to instill fear.  The only other theory supported by the evidence was that Torres accompanied defendant voluntarily.  Michele Valenzuela testified that Torres's hands were not bound when he left the laundry room and that he walked away with defendant after defendant said, "If you have nothing to hide, then come with me."  She did not see that Torres's hands were bound, although she believed that from her vantage point, she would have seen that his hands were bound if that were the case.  She also did not see a gun.  She did not perceive Torres to be in any danger.  Valenzuela's testimony supports either the conclusion that Torres went voluntarily with defendant or, perhaps, that Torres went out of fear that defendant would shoot him if he did not go with him, based on Torres's statement, "[I]f you are going to shoot me, then shoot me."  Neither interpretation of Valenzuela's testimony supports the inference that defendant used force which did not instill fear.  Consequently, there is no reasonable likelihood that the jury based the kidnapping finding on the use of force which did not instill fear.  Accordingly, we are convinced beyond a reasonable doubt that the instructional error did not contribute to the verdict.  (*Chapman*, *supra*, 386 U.S. at p. 24.)

　　*The Kidnapping Instruction Adequately Defined Fear.*

　　Defendant also contends that the instruction, which stated that kidnapping can be committed by "instilling reasonable fear," was insufficient because it failed to inform the jury of the nature of the fear which is required.  He contends that you must instill fear of some serious consequence, such as death or serious injury.

　　Although defendant is correct that the threat must be to impose some serious consequence, a threat of physical harm is not required.  In *People v. Majors*, *supra*, 33

35

Cal.4th 321, for example, the court held that "an implicit threat of arrest satisfies the force or fear element of section 207(a) kidnapping if the defendant's conduct or statements cause the victim to believe that unless the victim accompanies the defendant, the victim will be forced to do so, and the victim's belief is objectively reasonable." (*Id.* at p. 331.)

As given in this case, the kidnapping instruction adequately informed the jury that the victim's movement must be induced by an objectively reasonable fear. If defendant wished clarification or amplification, it was his burden to request it. In the absence of a request, the court was not required to give any further instruction. (*People v. Estrada*, *supra*, 11 Cal.4th at p. 574; *People v. Hughes*, *supra*, 27 Cal.4th at p. 361.)

*The Court Properly Instructed the Jury on Consent.*

Defendant contends that the kidnapping instruction erroneously included lack of consent as a separate element of kidnapping.

Although defendant is correct that "consent" does not appear in the statutory definition of kidnapping, consent is "inextricably intertwined" with the elements of force and fear, in that the gravamen of the offense is asportation against the victim's will. (*People v. Majors*, *supra*, 33 Cal.4th at pp. 326-327, 331.) Consequently, although lack of consent is not explicitly an element of the offense as defined by statute, it is nevertheless part of the prosecution's burden to prove that the asportation was against the victim's will, i.e., without consent. Moreover, consent is a defense to kidnapping, and a trial court has a sua sponte duty to instruct on that defense if the evidence warrants it and it appears that the defendant is relying on it. (*People v. Davis* (1995) 10 Cal.4th 463,

36

516-518.) Here, defendant contends that the evidence did not show that Torres unwillingly accompanied him from the laundry room but rather showed that he went voluntarily. Consequently, the instruction on consent was mandatory.

Defendant also contends that the kidnapping instruction erroneously allowed the jury to conclude that "anything that the jury perceives as interfering with the person acting freely and voluntarily may constitute lack of consent." He does not elaborate on this contention, and we may accordingly deem it forfeited. (*People v. Weaver* (2001) 26 Cal.4th 876, 986-987 [court need not consider contentions of error unaccompanied by legal argument].) Nevertheless, we note that the instruction correctly stated the general principles of law applicable to a defense of consent.[14] Again, if defendant had wished for clarification or for a pinpoint instruction relating the general principles to the facts of this case, he was required to request it. (*People v. Estrada*, *supra*, 11 Cal.4th at p. 581; *People v. Hughes*, *supra*, 27 Cal.4th at p. 361.)

8.

---

[14] The kidnapping instruction stated, "In order to consent, a person must act freely and voluntarily and know the nature of the act. [¶] . . . [¶] The defendant is not guilty of kidnapping if the other person consented to go with the defendant. The other person consented if he (1) freely and voluntarily agreed to go with or be moved by the defendant, (2) was aware of the movement, and (3) had sufficient maturity and understanding to choose to go with the defendant. The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant. If the People have not met this burden, you must find the defendant not guilty of this crime.

"Consent may be withdrawn. If, at first, a person agreed to go with the defendant, that consent ended if the person changed his or her mind and no longer freely and voluntarily agreed to go with or be moved by the defendant. The defendant is guilty of kidnapping if after the other person withdrew consent, the defendant committed the crime as [the court has] defined it."

37

THE COURT'S RESPONSE TO A JURY QUESTION WAS APPROPRIATE

During deliberations, the jury submitted the following question to the court: "'If you're going to shoot me' Verbal coercion? [*Sic.*] Is that an element of kidnapping—reasonable fear? Without visual proof of a gun?" After discussion with the parties and the approval of the defense, the court replied, "The elements for kidnapping are listed in CALCRIM No. 1215. The remaining questions are questions of fact that must be determined by the jury."

Defendant now contends that the court should have instructed the jury that "verbal coercion" is not an element of kidnapping. He also contends that the court should have amplified its previous instruction on the definition of fear and should have instructed the jury that "verbal coercion, moral coercion, deceit, fraud and trickery were insufficient to support a finding of kidnapping."

A trial court has a duty to clear up any "instructional confusion" expressed by the jury. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97; § 1138.) However, this does not mean that the court must elaborate on the standard instructions. Where the instructions are full and complete, "the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee*, at p. 97.) Here, the court's response was not an abuse of discretion. The jury's question asked whether the "verbal coercion" implicit in Torres's statement, "[I]f you are going to shoot me, then shoot me," satisfied the element of force or fear in the absence of evidence that defendant displayed a gun. The court's response was correct—it was a question of fact whether the statement was sufficient to support the

inference that defendant had a gun, or whether Torres thought he did, and whether Torres acted out of an objectively reasonable fear of harm in leaving the laundry room with defendant.

Defendant's remaining contentions, that the court should have elaborated on its definition of fear and should have explained the interplay between fear and consent, have already been addressed—if defendant had wished for clarification or for a pinpoint instruction relating the general principles of the law of kidnapping to the facts of this case, he was required to request it. (*People v. Estrada*, *supra*, 11 Cal.4th at p. 581; *People v. Hughes*, *supra*, 27 Cal.4th at p. 361.)

9.

MISTAKE OF FACT

A person is not guilty of an offense if he or she acted under a mistake of fact which disproves any criminal intent. (§ 26, par. Three.) A mistake of fact occurs when a person perceives facts differently from how they really exist. (*People v. Williams* (1992) 4 Cal.4th 354, 361-362.) A mistaken belief that the alleged victim of a kidnapping consented to be moved may be a defense to a kidnapping charge. (*People v. Mayberry* (1975) 15 Cal.3d 143, 155-156, 157.) Here, the defense sought only to raise a reasonable doubt as to Torres's actual consent. However, defendant contends that even though he did not rely on a mistake of fact defense at trial, the court was nevertheless obligated to instruct the jury on that defense because the evidence warranted it.

Mistake of fact, often called the *Mayberry* defense, requires a showing both that it was objectively reasonable to believe that the victim consented and that the defendant

39

actually believed that the victim consented. (*People v. Mayberry*, *supra*, 15 Cal.3d at pp. 155-157.) If the defendant did not rely on mistake of fact and did not request the instruction, the trial court nevertheless has a duty to instruct the jury on the defense if the instruction does not conflict with the defendant's theory of the case and there is substantial evidence of facts "that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*People v. Williams*, *supra*, 4 Cal.4th at p. 362.)

The Attorney General contends that the trial court was not required to instruct on mistake of fact in the absence of a request because the defense is not a special defense but merely seeks to negate an element of the charged offense. Consequently, she contends, the instruction is a pinpoint instruction required only upon request. She bases this contention on *People v. Anderson* (2011) 51 Cal.4th 989 (*Anderson*).

In *Anderson*, addressing the defendant's contention that the trial court had a sua sponte duty to instruct on accident as negating criminal intent, the court stated that a trial court's duty to instruct sua sponte extends to "instructions on the defendant's theory of the case, including instructions as to defenses that the defendant is relying on . . . or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. [Citation.] *But when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking sua sponte instructional duties.* While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the

evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request. [Citation.]" (*Anderson*, *supra*, 51 Cal.4th at pp. 996-997 [most internal quotation marks omitted for clarity; some italics added].)

Contrary to the Attorney General's position, however, the *Mayberry* defense *is* a special defense. The evidence that the defendant believed that the victim consented is not directed at negating the element of lack of actual consent; rather, the defense acknowledges that the victim did not actually consent but seeks to prove that the defendant acted without the required criminal intent because of his or her erroneous but objectively reasonable belief that the victim did consent. (*People v. Williams*, *supra*, 4 Cal.4th at p. 362.) Accordingly, *Anderson* has no bearing on this issue.[15]

Here, there was substantial evidence which meets the objective prong of *Mayberry*. Michele Valenzuela testified that after she heard Torres say, "[I]f you are going to shoot me, then shoot me," Torres and defendant came out of the laundry room. Defendant put his arm around Torres, and they walked away together. Valenzuela testified, contrary to Chavarria's testimony, that Torres's wrists were not bound. He did not ask Valenzuela for any help. Valenzuela's testimony rationally supports the

---

[15] We note that in *Anderson*, the court did not discuss nearly 40 years of precedent, beginning with *Mayberry*, that an instruction on mistake of fact to negate criminal intent must be given, even in the absence of a request, if the evidence supports the instruction and it does not conflict with the defendant's theory of the case. We will assume that if the court had intended to disapprove the *Mayberry* line of cases, it would have said so.

41

conclusion that Torres actually went willingly with defendant. Certainly, Valenzuela herself did not believe that Torres was acting under duress.

To meet the subjective prong of *Mayberry*, the defendant must produce, or point to, some evidence of the victim's equivocal conduct that led him reasonably to believe that the victim consented to the act when in fact the victim did not consent. (*People v. Williams*, *supra*, 4 Cal.4th at pp. 361-362.) The evidence may come from the defense or from the prosecution. (*Id.* at p. 361.)

Here, defendant contends that Michele Valenzuela's testimony that Torres appeared to be leaving voluntarily and defendant's statement to the police that Torres went with him voluntarily support the conclusion that defendant believed that Torres consented to accompany him. However, the essence of the subjective prong of *Mayberry* is evidence of equivocal conduct by the alleged victim which led the defendant to believe that the victim consented when he or she did not. (*People v. Williams*, *supra*, 4 Cal.4th at p. 362.) Here, in his statement to the police, defendant denied that Torres said, "If you're gonna shoot me, shoot me." He stated that Torres came with him voluntarily. This evidence, if believed, establishes that Torres actually consented; it does not show equivocal conduct by Torres that caused defendant to perceive facts differently from how they really existed. (*People v. Williams*, at pp. 361-362.)

Valenzuela's testimony, however, arguably does show equivocal conduct by Torres: She testified that Torres first expressed a fear that defendant was going to shoot him, and then accompanied defendant with no indication that he was acting under duress. Nevertheless, this does not mean that Torres's conduct was equivocal from *defendant's*

42

point of view. If defendant did threaten Torres with a gun, then defendant knew that Torres was not accompanying him voluntarily. If defendant did not threaten Torres and Torres did express a desire to come with defendant to talk about the rumor, as defendant said in his police interview, then Torres actually consented. This does not amount to substantial evidence which would support the subjective prong of the *Mayberry* defense. Accordingly, the court did not have a duty to give the instruction.

10.

A UNANIMITY INSTRUCTION ON KIDNAPPING WAS NOT REQUIRED

Defendant contends that the trial court committed reversible error by failing to give a unanimity instruction with respect to kidnapping felony murder and the kidnapping special circumstance. He contends that there were at least six separate acts, each of which could have supported a finding that defendant kidnapped Torres:

"The first movement was from the laundry room to the apartment complex location where Michele Valenzuela could see him, especially if Torres' wrists were zip-tied. But Michele testified Torres' hands were not bound when he left the laundry room. At the same time, even if Torres was not forcibly restrained, movement based on 'fear' was a possibility based on Torres' laundry room statement. In sum, this first movement could be based on force, fear or voluntary choice (i.e. Michele's yelling to take their business elsewhere).

"The second act could be based on movement from the apartment complex to the church parking lot. Michele testified she heard defendant tell Torres, 'If you have nothing to hide, then come with me.' (2 RT 295-296.) This movement, like the first

43

movement, could therefore be based on fear—the laundry room statement—or voluntary consent.

"The third act could be based on movement after defendant and Torres left the apartment complex, but before they reached the church parking lot. According to accomplice Chavarria's testimony, Torres arrived at the parking lot already bound with zip ties. Therefore, jurors could reason that at some point in time Torres was zip-tied after leaving the apartment complex but before reaching the church parking lot. This interpretation of the evidence would be consistent with Michele's testimony that Torres was not bound when he left the apartment complex.

"The fourth act could be based on movement from the church parking lot to defendant's apartment after Torres was zip-tied at the church parking lot. Amanda Valenzuela saw defendant, Torres and Chavarria walking side-by-side-by side [*sic*] toward the church, which directly contradicted Chavarria's testimony that he was walking in front of defendant and Torres and reached the church parking lot before them. Jurors knew that Chavarria downplayed his involvement and they could reasonably conclude, consistent with both Michele's and Amanda's testimony, that Torres was not bound with zip ties until after he reached the parking lot.

"The fifth act could be based on movement at defendant's apartment complex and/or within defendant's apartment after Torres was zip-tied either at or inside defendant's apartment. The jury, as previously noted, could reject accomplice Chavarria's testimony that Torres was zip-tied before he reached defendant's apartment based on the testimony of Michele and Amanda and defendant's statement to Torres,

44

'If you have nothing to hide, then come with me.' (2 RT 295-296.) Further, there was no corroboration of Chavarria's testimony concerning when Torres was zip-tied. It would be reasonable to assume that defendant would continue to act consistently with his 'nothing-to-fear' statement, especially if that is what prompted Torres to leave the apartment complex, and he would not have zip-tied Torres until the last possible moment.

"The sixth separate and distinct act could be based on movement at defendant's apartment complex and/or within the apartment after Torres left the church parking lot without defendant. Based on the testimony of Michele and Amanda and defendant's statements to police, jurors could conclude that Torres voluntarily went with defendant, they talked at the church parking lot, they separated, and Torres subsequently went to defendant's apartment based on defendant's invitation. Jurors could therefore conclude Torres was zip-tied at or in defendant's apartment and movement from the front room to the bedroom constituted forcible movement within the meaning of the kidnapping instructions. During closing arguments, the prosecutor actually argued that Torres' movement into the bedroom came within the definition of kidnapping. (4 RT 908.)"

Defendant bases his contention on the general principle that a criminal defendant is entitled to a unanimous verdict finding the defendant guilty of a specific crime. "In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the

45

jury to agree on the same criminal act.[16] [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Accordingly, a unanimity instruction is required if the jurors could disagree on which of two or more discrete acts constituted the offense and yet convict the defendant of the crime charged. (*People v. Davis* (2005) 36 Cal.4th 510, 560-561.)

The Attorney General dismisses defendant's contention by observing that kidnapping is a continuous offense: "'As long as the detention continues, the crime [of kidnapping] continues.' [(*People v. Cortez* (1992) 6 Cal.App.4th 1202, 1209.)]" This is correct, as far as it goes: Once defendant unlawfully moved Torres a substantial distance by force or fear and without his consent, a kidnapping occurred and did not end until Torres was killed. It does not address defendant's contention, however, that the evidence permits multiple conclusions as to when the kidnapping began.

Here, although we agree with defendant that the evidence permits many different conclusions as to when the kidnapping actually commenced, a unanimity instruction was not required. A requirement of unanimity typically applies to acts which could have been charged as separate offenses. (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 92.) "On the

---

**16** At oral argument, the Attorney General stated that the prosecutor did make an election, relying on the theory that Torres left the laundry room under compulsion because defendant threatened him with a gun. However, to satisfy the requirement of an election, the jury must be explicitly informed that the prosecutor has chosen to rely on a particular act to constitute the crime and that the jury can find the defendant guilty only if the jurors unanimously agree that the defendant committed that act. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534-1536.) The jury in this case was not so instructed.

other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.]" (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.) Stated another way, "a unanimity instruction is not required if the evidence shows only a single crime, albeit committed in several possible ways." (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 185 [Fourth Dist., Div. Two] and cases cited.) In summary, discrete crimes require unanimity instructions; theories of the case do not. Here, although the evidence reveals several possible theories as to how the kidnapping was committed, there is no evidence which would have allowed the district attorney to charge defendant with more than one kidnapping because, regardless of when the kidnapping commenced, it continued until Torres was murdered.

11.

FAILURE TO INSTRUCT ON INVOLUNTARY MANSLAUGHTER

Involuntary manslaughter is the unlawful killing of a human being without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Defendant contends that the trial court prejudicially erred by failing to instruct the jury on involuntary manslaughter, on the theory that defendant was criminally negligent in allowing Chavarria, a known gang member, to confront Torres with a gun while defendant himself was lawfully engaged in

47

questioning Torres about the rape rumor. If the jury concluded that Chavarria shot Torres, then it could convict defendant of involuntary manslaughter on that theory.

There is no evidence that defendant was engaged in "a lawful act which might produce death," with or without due caution or circumspection. Merely questioning someone is a lawful act, but it is not one which might produce death. Moreover, there is no evidence that defendant was merely questioning Torres: He had either kidnapped Torres or he had falsely imprisoned him in the apartment in order to question him. Neither kidnapping nor false imprisonment is a lawful act. If there is no evidence to support an instruction on a lesser included offense, the trial court has no duty to give the instruction. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

There was also no evidence whatsoever from which jurors could conclude that Chavarria, rather than defendant, shot Torres. Jurors could disbelieve Chavarria's version of the events, but that disbelief would not justify the conclusion that Chavarria shot Torres. At most, it permits a not guilty verdict because of insufficient evidence that defendant shot and killed Torres. Consequently, for this reason as well, the evidence does not support an instruction on involuntary manslaughter.

12.

PROSECUTORIAL MISCONDUCT

Defendant contends that the prosecutor committed two acts of prejudicial misconduct: When he deliberately elicited evidence that Chavarria was a gang member, after the court had ruled that there was to be no mention of gangs; and when he argued to the jury that Torres's statement, "[I]f you are going to shoot me, then shoot me," proved that defendant displayed a gun to Torres in the laundry room.

As to the laundry room statement, we have previously concluded that Torres's statement was admissible as circumstantial evidence that defendant displayed a gun in the laundry room. (See § 1, *ante*.) Accordingly, the prosecutor's argument to that effect was not misconduct.

As to the gang evidence, eliciting inadmissible testimony is prosecutorial misconduct. (*People v. Tully* (2012) 54 Cal.4th 952, 1035.) This is true even if the error was inadvertent. (*People v. Hill* (1998) 17 Cal.4th 800, 822-823.) Here, during motions in limine, the parties agreed that this was not a "gang case," in that the allegation that the crime was committed in furtherance of the interests of a criminal street gang (§ 186.22, subd. (b)) had been dropped from the information. The prosecutor stated that he did not intend to suggest to the jury in any way that it was a gang case. The court did not, at that time, specifically order the parties not to mention gangs during the trial, but it appears from the record that both parties understood that this was the court's intention. However, when defense counsel noted that the local press had been referring to it as a "gang case," the court agreed that during voir dire counsel could state to the prospective jurors that

49

regardless of what they might have seen in the press, this was not a gang case. The court placed no limitations on the parties with respect to how they addressed the issue in voir dire.

During the trial, the court reiterated that there was to be no mention of gangs. Nevertheless, during his direct examination of Chavarria, the prosecutor asked Chavarria about his criminal record, including the following: "And then a misdemeanor offense with that same incident [felony evading a police officer in 2009] of being an active participant in a criminal street gang?" Chavarria replied, "Yes, that is correct."

Defendant did not object or seek to have the answer stricken. Shortly afterward, during a conference in chambers, the court chastised the prosecutor for ignoring the court's prior order. Defense counsel did not request any curative action by the court.

As defendant acknowledges, to preserve a claim of prosecutorial misconduct for appellate review, the defendant must make a contemporaneous objection and ask the trial court to admonish the jury to disregard the impropriety, or seek a mistrial. (*People v. Carrera* (1989) 49 Cal.3d 291, 321.) The requirement is waived if an objection would have been futile or an admonition would not cure the harm. (*Ibid.*) Defendant contends that an admonition would not have cured the harm in this instance, in part because gang evidence is inherently prejudicial and the admission of the evidence that Chavarria was a gang member allowed the jury to speculate that defendant was a member of the same gang. In addition, because defense counsel had informed the jury during voir dire that this was not a gang case and that news reports to the contrary were incorrect, the

erroneous admission of Chavarria's gang membership damaged the credibility of the defense.

Even if we assume that no objection or request for an admonition or a mistrial was required, the misconduct does not require reversal.

During voir dire, both attorneys discussed gang concepts with the prospective jurors, as the trial court had allowed them to do. Defense counsel told the jurors that this was "not a gang case." The implication was that the crime was not gang-related, contrary to what had been said in a local newspaper. She did not say that none of the witnesses were gang members. Later, the prosecutor alluded to the possibility that one or more of the witnesses were gang members: He asked one prospective juror if he or she would automatically reject the testimony of a witness if there was evidence that the witness was a gang member or had a felony record. The jury was thus aware that one or more witnesses might be gang members and that they could not allow that fact to cause them to automatically reject the witness's testimony. Upon hearing that Chavarria had a misdemeanor conviction for gang participation, jurors undoubtedly realized that it was Chavarria the prosecutor was talking about during voir dire, not defendant.

Prosecutorial misconduct violates federal due process principles if it comprises a pattern of conduct so egregious that it infects the trial, rendering it fundamentally unfair. (*People v. Clark* (2011) 52 Cal.4th 856, 960.) Under California law, prosecutorial misconduct which does not render the trial fundamentally unfair requires reversal if it is reasonably probable that a result more favorable to the defendant would have occurred in the absence of the misconduct. (*People v. Martinez* (2010) 47 Cal.4th 911, 955-956.)

51

Here, the single mention of Chavarria's misdemeanor gang activity conviction did not render the trial fundamentally unfair or result in prejudice under the California standard. If the evidence of Chavarria's misdemeanor conviction had any effect on the trial, it is more likely that it caused jurors to be skeptical of Chavarria's claim that he was more or less a bystander to defendant's crime than it is to have caused otherwise unpersuaded jurors to conclude that defendant was guilty.

13.

## THE COURT WAS NOT REQUIRED TO INSTRUCT THAT HEAT OF PASSION CAN NEGATE INTENT TO KILL FOR PURPOSES OF THE FELONY-MURDER SPECIAL CIRCUMSTANCE

Defendant was charged with the special circumstance of murder while engaged in the commission or attempted commission of a kidnapping. (§ 190.2, subd. (a)(17)(B).) Defendant contends that the trial court should have instructed the jury that heat of passion can negate the intent to kill required for the special circumstance. He acknowledges that the California Supreme Court rejected that argument in *People v. Hawkins* (1995) 10 Cal.4th 920, but he contends that more recent Supreme Court decisions have called the validity of *Hawkins* into question. He also contends that *Hawkins* created "intolerable anomalies" which the court did not consider.

*Hawkins* holds that although heat of passion can negate malice for purposes of reducing a homicide from murder to voluntary manslaughter, it does not also negate the intent to kill, which, it held, is an essential element of voluntary manslaughter: "'Voluntary manslaughter is a willful act, characterized by the presence of an intent to

52

kill, engendered by sufficient provocation and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought.' [Citation.] Accordingly, a defendant who kills upon a sudden quarrel or in the heat of passion in the course of committing a felony would still be found to have an intent to kill within the meaning of our *Carlos*[17] decision, and the felony-murder special circumstance would still be applicable to him." (*People v. Hawkins*, *supra*, 10 Cal.4th at pp. 958-959.)

*Hawkins* was abrogated, in part, by *People v. Lasko* (2000) 23 Cal.4th 101. There, the court held that voluntary manslaughter does not necessarily include the intent to kill, and held that an unintentional killing, committed while the defendant was acting with a conscious disregard for life during a sudden quarrel or in the heat of passion, is not murder but voluntary manslaughter. The court held that a person who kills during a sudden quarrel or in the heat of passion lacks malice "regardless of whether there was an intent to kill." (*Id.* at pp. 108-110.) In *People v. Blakeley* (2000) 23 Cal.4th 82, the court also held that a person who kills in unreasonable self-defense is guilty of voluntary manslaughter, regardless of whether the killing is intentional or unintentional. (*Id.* at pp. 87-91.)

Although these decisions abrogate *Hawkins* to the extent that it held that intent to kill is an essential element of voluntary manslaughter, *Hawkins* is nevertheless correct that a sudden quarrel or in the heat of passion negates malice but not intent to kill: Because intent to kill is irrelevant to a conviction for voluntary manslaughter, as held in *Blakeley* and *Lasko*, it need not be negated in order for a homicide to be voluntary

---

17 *Carlos v. Superior Court* (1983) 35 Cal.3d 131.

manslaughter rather than murder.  Consequently, defendant was not entitled to the instruction on the negation of intent for purposes of the special circumstance.

14.

THERE WAS NO CUMULATIVE ERROR

Finally, defendant contends that even if none of the errors he asserts was individually reversible, the cumulative effect of two or more such errors was sufficiently prejudicial to require reversal.

We have rejected almost all of defendant's claims of error.  We found error in the kidnapping instruction's definition of the element of force or fear, but found it harmless beyond a reasonable doubt.  Because there were no other errors, there is no basis for finding the cumulative effect defendant asserts.

1.

## THE SENTENCE IS UNAUTHORIZED TO THE EXTENT THAT IT
## STAYS VICTIM RESTITUTION

*Summary of the Issue*.

Section 1202.4 provides, in pertinent part, as follows:

"(a)(1) It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime.

"[¶] . . . [¶]

"(f) Except as provided in subdivisions (q) and (r), in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court. The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so and states them on the record. . . .

---

**18** On March 9, 2012, defendant filed a motion to dismiss the People's appeal. The court has considered the motion and the opposition filed on April 16, 2012. The motion to dismiss is denied.

"(1)  The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution.  The court may modify the amount, on its own motion or on the motion of the district attorney, the victim or victims, or the defendant.  If a motion is made for modification of a restitution order, the victim shall be notified of that motion at least 10 days prior to the proceeding held to decide the motion.

"(2)  Determination of the amount of restitution ordered pursuant to this subdivision shall not be affected by the indemnification or subrogation rights of a third party.  *Restitution ordered pursuant to this subdivision shall be ordered to be deposited to the Restitution Fund to the extent that the victim, as defined in subdivision (k), has received assistance from the California Victim Compensation and Government Claims Board pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code.*"  (Italics added.)

Here, the probation report stated that the "Victim of Crime program" had provided the victim's family $7,500 for funeral expenses.  It recommended that the court order defendant to pay restitution in that amount to the Victim Compensation Government Claims Board, with interest at 10 percent a year.

Defendant did not seek a hearing to dispute the amount of victim restitution, nor did he dispute that the victim's family received $7,500 for funeral expenses.  He did, however, ask the trial court to order no victim restitution and no restitution fine or parole revocation fine.  He contended that because he was to be sentenced to life without the possibility of parole, he would not be allowed to earn any money in prison.  He also stated that he has no existing funds out of which to pay restitution.  Thus, his only source

of funds during his incarceration would be money provided by his family or friends. However, he stated, the Department of Corrections and Rehabilitation deducts 20 to 50 percent of an inmate's wages to pay restitution orders. This would include any funds provided by defendant's family or friends. He stated that because of budgetary issues, inmates are now being required to pay for their toiletries, such as soap, toothpaste, shampoo and razors. His only source of funds for such necessities would be his friends and family. Accordingly, defendant argued that a restitution order would effectively place the burden for restitution on people other than defendant himself.

Defendant also contended that this would constitute a compelling and extraordinary reason for denying restitution. Further, because the Victim Compensation and Government Claims Board is not a "victim" as defined by section 1202.4, subdivision (k), defendant contended that the trial court should not make a restitution order for the board's benefit.

At the sentencing hearing, the court stated that it would impose victim restitution in the recommended amount of $7,500 but would suspend it "on the chance that if he does somewhere down the line get paroled." If that happened, then defendant would "be required to make that payment."

After further argument, the court imposed the sentence of life without the possibility of parole and then stated, "I'm going to impose the restitution of $7,500; however, I'm willing to suspend the imposition of that restitution fine unless [defendant] is granted parole." Upon a request by defense counsel for clarification, the court said, "The restitution fine I'm imposing. The restitution to the victim's [*sic*] compensation

57

fund, I stayed that." Upon further request by the defense, the court reduced the amount of the restitution fine and parole revocation fine from $10,000 each to $1,000 each.

The district attorney filed a timely notice of appeal from "the unlawful restitution order" "pursuant to Penal Code section 1238, subdivision (a)(5)."[19]

*The Order Staying Restitution Is Appealable*

Defendant asserts that the restitution order is not appealable.

First, he contends that the prosecution waived any objection by not raising it in the trial court. However, the prosecution did oppose defendant's motion for no restitution. Consequently, there was no waiver.

Second, defendant contends that the prosecution had the burden to establish the legitimacy of the award of $7,500 in restitution to the Victim Compensation Board, and that its failure to do so waives the issues raised in the People's appeal. Defendant is mistaken. With respect to a claim by a victim for economic losses, section 1202.4, subdivision (f) does not require any specific form of proof. The court may accept the victim's statement reflected in the probation report as prima facie evidence of loss. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1543 [Fourth Dist., Div. Two].) Once the victim makes a prima facie showing of economic losses incurred as the result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses suffered by the victim. (*Ibid.*; see also § 1202.4, subd. (f), (f)(1).)

Where the Restitution Fund has provided assistance to a victim, section 1202.4, subdivision (f)(4)(B) does require that the amount provided "shall be established by

---

[19] We will hereafter refer to the cross-appellant as "the People."

58

copies of bills submitted to the California Victim Compensation and Government Claims Board." Nevertheless, because a defendant may request a hearing to dispute the amount of restitution (§ 1202.4, subd. (f)(1)), the defendant's failure to do so waives any claim that the amount stated in the probation report is incorrect. In *People v. Brasure* (2008) 42 Cal.4th 1037, the defendant challenged a victim restitution order on the ground that the victim's loss "was not shown by documentation or sworn testimony." (*Id*. at p. 1075) In holding that the defendant had not preserved the contention for appeal, our Supreme Court stated: "[B]y his failure to object, defendant forfeited any claim that the order was merely unwarranted by the evidence, as distinct from being unauthorized by statute. [Citation.] As the order for restitution was within the sentencing court's statutory authority, and defendant neither raised an objection to the amount of the order nor requested a hearing to determine it [citation], we do not decide whether the court abused its discretion in determining the amount." (*Id.* at pp. 1074-1075.)[20]

Here, defendant did not dispute that the victim's family had been reimbursed $7,500 in funeral expenses, nor did he dispute the fact that the victim's family had actually incurred funeral expenses in that amount.[21] Consequently, the trial court

---

[20] *Brasure's* holding was criticized in *In re K.F.* (2009) 173 Cal.App.4th 655 as contrary to the rule stated in other contexts by the California Supreme Court that a challenge to the sufficiency of the evidence may be raised on appeal even if no objection was made in the trial court. (*Id.* at pp. 660-661.) Nevertheless, *Brasure* is directly on point, and we are bound by it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

[21] For purposes of section 1202.4, "victim" includes the immediate surviving family of the actual crime victim. (§ 1202.4, subd. (k).)

properly accepted the amount recited in the probation report, and the prosecution was under no obligation to provide further evidence.

As we discuss below, the court's order staying restitution resulted in an unauthorized sentence and is subject to challenge at any time. Section 1238, subdivision (a)(10) provides that the People may appeal from the imposition of an unlawful sentence, whether or not the court suspends execution of the sentence. Consequently, the People have standing to appeal.

*The Sentence Is Invalid to the Extent It Stays Victim Restitution.*

Victim restitution is mandatory in every case in which a victim suffers a loss, unless the trial court finds that compelling and extraordinary reasons exist to dispense with restitution and states those reasons on the record. (Cal. Const., art. I, § 28, subd. (b); § 1202.4, subd. (b).) If the Restitution Fund has provided any assistance to a victim which was necessitated by the defendant's conduct, the restitution award must include the amount provided by the Restitution Fund. (§ 1202.4, subd. (f)(4)(A).) A sentence that omits a restitution order without a finding of compelling and extraordinary reasons is invalid. (§ 1202.46; *People v. Brown* (2007) 147 Cal.App.4th 1213, 1225.) And, a sentence which omits a restitution order without a finding of compelling and extraordinary reasons may be challenged at any time. (§ 1202.46; *People v. Moreno* (2003) 108 Cal.App.4th 1, 9-10.)

Here, the sentence included a restitution order, but the court ordered it stayed unless defendant was released on parole. The court did not state any compelling and extraordinary reason for doing so. Because defendant was sentenced to life

60

imprisonment without the possibility of parole, the event which would lift the stay and bring the restitution order into execution could never occur. Accordingly, the sentence in effect did not include a restitution order, and it is invalid to that extent.

We will remand the matter with directions to the trial court to impose an unstayed restitution order directing that $7,500 be paid to the Restitution Fund, unless the court determines that there is a compelling and extraordinary reason for omitting victim restitution all together.

2.

THE PAROLE REVOCATION FINE IS NOT AUTHORIZED

If a defendant is sentenced only to a term of life in prison without the possibility of parole, a parole revocation fine is not authorized because parole is not a possibility. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181, cited with approval in *People v. Brasure*, *supra*, 42 Cal.4th at p. 1075.) Here, defendant was sentenced to life without the possibility of parole. Accordingly, the parole revocation fine must be stricken.

DISPOSITION

The sentence is vacated and the cause is remanded for further sentencing proceedings. The superior court is directed to impose an unstayed restitution order directing that $7,500 be paid to the Restitution Fund, unless the court determines that there is a compelling and extraordinary reason for omitting or reducing victim restitution. The court shall also impose a restitution fine, and shall strike the parole revocation fine.

The superior court clerk is directed to issue an amended abstract of judgment and shall provide a copy to the parties and to the Department of Corrections and Rehabilitation.

The judgment is otherwise affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.