[No. D037469. Fourth Dist., Div. One. Dec. 31, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS DANIEL NARVAEZ et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II., III., IV., V., VI.

## COUNSEL

Kristine M. Watkins and Sharon L. Rhodes, under appointments by the Court of Appeal, for Defendant and Appellant Douglas Daniel Narvaez.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Jose Manuel Narvaez.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Adrian Albert Flores.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steven T. Oetting and Kevin R. Vienna, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

McCONNELL, J.—This is a robbery case in which the court allowed the testimony of an accomplice of the defendants, the driver of the getaway car. In the published part of this opinion, we hold that independent evidence the defendants were in possession of jewelry stolen during the crime is sufficient to corroborate the accomplice's testimony. (Pen. Code, § 1111.) We reverse the convictions for receiving stolen property, but in all other respects we affirm the judgments.[2]

---

[2]In the unpublished part of the opinion, we address all three appellants' contentions that their convictions on three of the robbery counts must be reversed on the basis of insufficient

## FACTS

Defendants Douglas Daniel Narvaez, Jose Manuel Narvaez and Adrian Albert Flores were each convicted of four counts of robbery (Pen. Code,[3] § 211) and receiving stolen property (§ 496, subd. (a)). In addition, the jury found Douglas Narvaez and Flores guilty of unlawful possession of a firearm by a felon (§ 12021.1, subd. (a)); Douglas Narvaez and Flores personally used a firearm in the commission of the robberies within the meaning of sections 12022.53, subdivision (b), and 12022.5, subdivision (a)(1), and Jose Narvaez was armed in the commission of the robbery within the meaning of section 12022, subdivision (a)(1). In a separate proceeding, the trial court found Douglas Narvaez and Flores each suffered two prior serious/violent felony convictions or "strikes" (§§ 667, subds. (b)-(i), 1170.12), two prior serious felony convictions (§ 667, subd. (a)(1)), and two prior prison convictions (§ 667.5, subd. (b)). The trial court sentenced Douglas Narvaez to a prison term of 46 years to life, Adrian Flores to a prison term of 45 years to life, and Jose Narvaez to a prison term of four years.

### Prosecution Evidence

About 5:00 p.m. on April 5, 2000, three armed men wearing dark clothes, gloves and masks entered Trepco West (Trepco), a wholesale distributor. One man went to the office of Wiam Kamil, the office manager. He grabbed her by the hair, pointed a gun at her head and said: "Bring out all the money. Show me where all your money is." Using her keys, Kamil opened the smaller of the two company safes in her office, removed about $5,000 in cash and some checks and placed those items in a plastic bag provided by the robber. The robber then said: "Where's the rest of it? This isn't all. I know this isn't all of it." Kamil replied that cash was kept in the cash register in another area and led him through a computer room, which was on the way to the warehouse.

A second robber was in the computer room holding Kamal Sadiq, a salesman, at gunpoint. When Kamil reached the warehouse door, the first robber yelled at her: "You're lying to me, bitch. Why are you lying to me? You know it's not out there." Holding her, he continued: "Do you want me to shoot you in the leg? You're lying to me. Do you want me to shoot you?"

---

evidence, instructional error and principles of aiding and abetting liability, and that it was improper to convict them of both robbery and receiving property stolen during the robbery. We also address the argument by Flores, joined by Douglas Narvaez, that three personal firearm use enhancements must be reversed. Finally we consider the argument by Douglas Narvaez that his conviction of unlawful possession of a firearm by a felon cannot stand because no unanimity instruction was given.

[3] All statutory references are to the Penal Code unless otherwise specified.

The robber in the computer room urged: "Teach her a lesson. Shoot her in the leg." Kamil led the first robber back to her office and opened the larger company safe. Kamil removed about $60,000 in cash and boxes containing her jewelry, which she kept in the safe; she placed these items in the plastic bag. The jewelry was worth at least $30,000.

Meanwhile, the robber in the computer room had hit Sadiq in the head and shoulder after telling him to lie on the floor. The robber took Sadiq's watch and $120 from his wallet. Rafid Hana, who worked in the warehouse, came into the business area and was confronted by the computer room robber and one of his cohorts. One of these robbers took Hana's wallet.

The third robber had followed the receptionist into the office of Wail Paulus, president of the company, who was meeting with George Hurley, Jr., Trepco's attorney. At gunpoint, the robber ordered the receptionist, Paulus and Hurley to lie down and crawl into the reception area. The receptionist and Paulus complied. The robber grabbed Hurley, who was seated in a chair, by the right shoulder, pulled him from the office to the reception area and forced him to lie facedown on the carpet. The robber took Paulus's watch.

The robbers fled in a white Mitsubishi Mirage, which was parked outside the warehouse. During the holdup, a Trepco employee had telephoned the police and given them the license plate number of the Mitsubishi. The registered owner of the Mitsubishi was Guiller Palugod, who told police he was in the process of selling the vehicle to Christopher Mendoza. Police subsequently interviewed Mendoza, who was in custody on an unrelated matter, and told him they were looking for the vehicle. Based on information provided by Mendoza, police found the Mitsubishi parked near Douglas Narvaez's apartment and impounded it.

On April 13, police interviewed Mendoza for a second time after he inquired about the impounded Mitsubishi. At first, Mendoza denied involvement in the robbery, but later admitted he was the getaway driver. Although he initially gave police false names for the other participants, Mendoza eventually identified Douglas Narvaez, Flores and Carlos Cardenas as the robbers.[4]

That evening, police began a surveillance of Douglas Narvaez's apartment. Police followed Douglas Narvaez, his girlfriend Martha Lopez, and another woman after they left the apartment. Eventually, the police stopped their car and searched them. Douglas Narvaez had $6,419 in cash and a Las Vegas casino deposit slip for $6,500. Lopez was wearing a bracelet and

---

[4]Cardenas had not been arrested when this case was tried.

carrying a small gold box in her purse containing a ring and a lion's claw charm. Kamil later identified these three pieces of jewelry as items stolen during the robbery.

Later that evening, police, using Douglas Narvaez's keys, entered his apartment to conduct a search. Douglas Narvaez's father, Jose Narvaez, was present; he had been living in the apartment with his son since January. The police found $5,251 in cash in Jose Narvaez's pants, and small plastic baggies and pay-and-owe sheets used by drug dealers.

Police obtained a search warrant to a safety deposit box that Jose Narvaez rented on April 6. Inside the box was $15,100 in cash divided into three bundles, and numerous pieces of jewelry, including 12 pieces of jewelry that Kamil later identified as items stolen during the robbery.

On April 30, police arrested Flores, who was wearing a gold chain with a religious medallion, a gold bracelet and a gold ring with a "T" on it. Kamil later identified two of these pieces as her jewelry.

Mendoza signed a cooperation agreement with the district attorney's office and pleaded guilty to a single count of robbery in exchange for his testimony. At trial, he testified as follows:

Douglas Narvaez was Mendoza's source for methamphetamine. On April 4, Mendoza walked in on a discussion between Douglas Narvaez, Flores and Cardenas about a robbery they were planning. Douglas Narvaez asked Mendoza if he was willing to drive and Mendoza agreed. Everyone was to meet back at the Narvaez apartment at 11:00 a.m. the following day.

The next morning, Mendoza observed Flores cutting eyeholes in a black beanie cap and Douglas Narvaez, Flores and Cardenas putting on long-sleeved, dark clothing and looking for gloves. At 3:30 p.m., Douglas Narvaez, Flores, Cardenas and Jose Narvaez left the apartment in the father's Cadillac. Mendoza followed in his Mitsubishi. Jose Narvaez drove to an apartment complex, where Douglas, Flores and Cardenas got out of the Cadillac and into Mendoza's Mitsubishi. Mendoza drove to a tamale shop, where he was instructed to ask for a plastic bag. Mendoza then drove to the parking lot of Trepco, where Douglas Narvaez, Flores and Cardenas—each wearing a mask and gloves and carrying a gun—got out; Mendoza stayed in the car with the engine running.

In less than two minutes, Flores returned. He was followed by Cardenas and Douglas Narvaez, who carried a large plastic trash bag containing "a

bunch of white objects." Mendoza drove off and returned to the apartment complex where Jose Narvaez had parked before. Douglas Narvaez, Flores and Cardenas got out and directed Mendoza to get rid of the car. Mendoza drove to a nearby mobilehome park and left his car there.

Mendoza got a ride back to Douglas Narvaez's apartment, where the three robbers were separating the money. Douglas Narvaez gave Mendoza $1,100; Mendoza expected Cardenas to give him additional money later. Later, three women from the apartment drove Mendoza in Jose Narvaez's Cadillac to the mobilehome park to retrieve the Mitsubishi. Mendoza drove his car to a bar in Mission Valley, followed by the Cadillac. Mendoza parked his car in the parking lot and rode back to Douglas Narvaez's apartment in the Cadillac. The next morning, Mendoza was driven back to his car, which he then drove home.

Mendoza returned to Douglas Narvaez's apartment on April 6 and parked the Mitsubishi on the street. At that time, he located a jewelry bag under his passenger seat. Thinking the jewelry must belong to one of the women who frequented the Narvaez apartment, Mendoza turned the bag over to Douglas Narvaez, who said, "Well, that's mine." Douglas Narvaez took two toe rings out of the bag and gave them to Mendoza, who in turn gave them to his girlfriend. That evening, Mendoza went to a Tijuana nightclub with Douglas Narvaez, Flores, Cardenas and five women. That weekend the same group went to Magic Mountain.

The prosecution also presented evidence that Douglas and Jose Narvaez stayed at the New York New York casino in Las Vegas between April 11 and 13.[5] Douglas Narvaez reserved the room on April 8. On arrival at the casino, he established a player's account by depositing $6,500 in the casino cage. According to casino records, Douglas Narvaez lost $17,400 in gambling during his stay, with an average bet of $578. During trips to the casino in February and March, his average bet was $180 and $112. The casino estimated that in the April trip Jose Narvaez lost $2,180 gambling.

*Defense Evidence*

Women friends of Douglas Narvaez and Lopez testified they were at an all-day party at his apartment on April 5 and he did not leave the apartment. Douglas Narvaez also called a police officer who testified that on April 5 robbery victims Hana and Sadiq told him one of the robbers was "a Black male."

Douglas Narvaez presented the videotape of Mendoza's April 13 police interview. During the interview, the detective asked Mendoza if it were

---

[5]Flores and others joined them in Las Vegas April 12.

possible the Mitsubishi was used in a crime, and Mendoza replied: "No sir. I swear to God. I swear on my daughter's and grandfather's grave and everything. Not that I know of, no."

Testifying in his own defense, Jose Narvaez denied any involvement in the robbery. He testified he had been a professional gambler in New York, and he accompanied his son to Las Vegas to teach him how to deceive the casino into believing he was losing more money than he actually was losing to qualify for complimentary items from the casino. Jose Narvaez brought about $45,000 in cash with him when he came to San Diego, and the cash in his pants and in the safety deposit box was part of that money. The jewelry found in the safety deposit box was his own jewelry and jewelry his son Douglas had given him the morning of April 6.

Sabrina Rivera, Flores's fiancée, testified they were at a restaurant when the robbery occurred. She also testified she had purchased and given Flores the jewelry he was wearing when he was arrested. Rivera also testified that Mendoza paid a lot of attention to her during the trip to Magic Mountain and Flores told him to leave her alone.

The parties stipulated that of 10 fingerprints found in Mendoza's Mitsubishi, none belonged to Douglas Narvaez, Flores or Cardenas. The parties also stipulated that Douglas Narvaez and Flores were previously convicted of a felony.

## DISCUSSION

### I. *Sufficiency of Corroboration of Accomplice Testimony*

Section 1111 provides:

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The trial court instructed the jury that Mendoza was an accomplice as a matter of law, and the defendants do not challenge the instruction.

Rather, Douglas Narvaez and Flores contend there is insufficient evidence to corroborate Mendoza's testimony.

Evidence that sufficiently corroborates an accomplice's testimony " ' "must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime[,] but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].) The evidence necessary to corroborate accomplice testimony need only be slight, such that it would be entitled to little consideration standing alone. (*People v. Sanders* (1995) 11 Cal.4th 475, 534-535 [46 Cal.Rptr.2d 751, 905 P.2d 420].) It is enough that the corroborative evidence tends to connect defendant with the crime in a way that may reasonably satisfy a jury that the accomplice is telling the truth. (*Id.* at p. 535.) Corroborative evidence may be entirely circumstantial. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271 [91 Cal.Rptr.2d 211, 989 P.2d 645].) The determination by the trier of fact "on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 985 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

To corroborate Mendoza's testimony, the prosecution presented independent evidence the defendants were in possession of Kamil's jewelry after the robbery. In photographs taken the day after the robbery, Lopez, Douglas Narvaez's girlfriend, was wearing one of Kamil's stolen bracelets. When Douglas Narvaez and Lopez were arrested a week later, she had three pieces of Kamil's stolen jewelry in her possession. When Flores was arrested on April 30, he was wearing jewelry stolen during the robbery. In Jose Narvaez's safety deposit box, which he rented the day after the robbery, police found 12 pieces of Kamil's stolen jewelry.

Douglas Narvaez and Flores contend that evidence of possession of stolen property is insufficient to corroborate an accomplice's testimony because such evidence itself needs corroboration to prove a defendant's guilt. (See CALJIC No. 2.15.) However, they cite no authority for their proposition. "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906], disapproved on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3 [98 Cal.Rptr. 217, 490 P.2d 537]; *People v. Sierra* (1995) 37 Cal.App.4th 1690, 1693, fn. 2 [44 Cal.Rptr.2d 575].)

██    In any event, the defendants' position is without merit. It is established that "[t]he possession of recently stolen property is sufficient to support corroboration for an accomplice's testimony." (*People v. Jenkins* (1973) 34 Cal.App.3d 893, 900 [110 Cal.Rptr. 465]; *People v. Garrison* (1989) 47 Cal.3d 746, 773 [254 Cal.Rptr. 257, 765 P.2d 419].)   ██    Moreover, the reason for the rule requiring corroboration before evidence of possession of stolen property can raise an inference that the possessor is guilty of theft, is markedly different from the reason corroboration is required for accomplice testimony. In the former instance, corroboration is required because evidence of possession of stolen property raises a strong inference of guilt. As the United States Supreme Court noted in *Barnes v. United States* (1973) 412 U.S. 837, 843 [93 S.Ct. 2357, 2362, 37 L.Ed.2d 380], this is "a traditional common-law inference deeply rooted in our law" and dates back a dozen centuries. CALJIC No. 2.15 "relates a contrary proposition: a burglary may not be presumed from mere possession unless the commission of the offense is corroborated." (*People v. Johnson* (1993) 6 Cal.4th 1, 37 [23 Cal.Rptr.2d 593, 859 P.2d 673].) "It is a permissive, cautionary instruction which inures to a criminal defendant's benefit by warning the jury not to infer guilt merely from a defendant's conscious possession of recently stolen goods, without at least some corroborating evidence tending to show the defendant's guilt." (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1174 [111 Cal.Rptr.2d 403].)

Accomplice testimony, on the other hand, must be corroborated because it is inherently suspect. In *People v. Coffey* (1911) 161 Cal. 433, 438 [119 P. 901], our Supreme Court explained: "[I]t was, of course, recognized that evidence of an accomplice, coming from a tainted source, the witness being . . . a man usually testifying in the hope of favor or the expectation of immunity, was not entitled to the same consideration as the evidence of a clean man, free from infamy. Hence, it soon became the practice of the common law judges, in the wide latitude allowed to them in the instruction of their juries, to advise the latter that the testimony of an accomplice . . . was to be viewed with care, caution and suspicion." Accordingly, the jury must be instructed to view the testimony of an accomplice with caution. (*People v. Williams* (1997) 16 Cal.4th 635, 679 [66 Cal.Rptr.2d 573, 941 P.2d 752].)

██    The evidence that the defendants were in possession of the stolen jewelry is direct physical evidence that does not rely on witness credibility. Thus, there is no taint of improper motive. We find no legal reason why the evidence is insufficient to corroborate Mendoza's testimony.

Further, the prosecution presented independent evidence that linked the defendants to the stolen money. After the robbery, Douglas Narvaez went on

a spending and gambling spree. He took a group of friends, including Flores, to Magic Mountain overnight and apparently picked up the tab. Three days after the robbery, Douglas Narvaez arranged for a trip to Las Vegas the following week. Upon arrival in Las Vegas, he deposited $6,500 at the casino, and in two days he lost more than $17,000 gambling. His average bet during this trip was more than two times his average bet during other recent gambling trips. Further, he had more than $5,000 in cash on his person when he was arrested.

In handling cash receipts for Trepco, Kamil had a habit of bundling $100 bills in $5,000 stacks and using colored rubber bands. Police found more than $15,000 in cash bundled in the same manner in Jose Narvaez's safety deposit box. When he was arrested, he had more than $5,000 in his pants pockets.

Yet, during this period, Douglas and Jose Narvaez were living in a sparsely furnished one-bedroom apartment in which numerous people regularly stayed overnight. The jury could reasonably infer from the timing surrounding these events that the newly acquired wealth coincided with the robbery of Trepco. We conclude that with respect to Douglas Narvaez, there was an abundance of corroborating evidence.

There was markedly less corroboration evidence as to Flores. However, the entire conduct of the parties, their relationship, and their acts during and after the crime may be taken into consideration by the jury in determining the sufficiency of the corroboration of an accomplice's testimony. (*People v. Williams* (1954) 128 Cal.App.2d 458, 462 [275 P.2d 513]; see also *People v. Henderson* (1949) 34 Cal.2d 340, 343 [209 P.2d 785] ["The relationship of the men and all of their acts and conduct may be considered in determining whether there are corroborating circumstances."].) Considering Flores's relationship with Douglas Narvaez, their joint activities after the robbery and Flores's possession of the stolen jewelry when arrested, there was adequate corroborating evidence.

## II.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The convictions of Douglas Narvaez (count 5), Jose Narvaez (count 7), and Flores (count 6) for receiving stolen property are reversed. The trial

*See footnote, *ante*, page 1295.

court shall amend the abstracts of judgment accordingly and forward copies of the amended abstracts of judgment to the Department of Corrections. In all other respects, the judgments are affirmed.

Kremer, P. J., and Benke, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 19, 2003.