Filed 12/12/25  P. v. Agustin CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PASCUAL AGUSTIN,<br><br>    Defendant and Appellant. | D083921<br><br><br>(Super. Ct. No. SCN425910) |

APPEAL from a judgment of the Superior Court of San Diego County, Laura E. Duffy, Judge.  Affirmed.

Bulldog Law, Mario Tafur and Joshua J. Schroeder for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Pascual Agustin appeals from his seven-count sex crime conviction, challenging the actions of all involved in his trial.  He argues (1) the jury's

verdicts were not supported by substantial evidence; (2) he received ineffective assistance of counsel; (3) the trial court abused its sentencing discretion; (4) the trial court was biased; and (5) the prosecutor committed misconduct. Agustin raises more claims in his reply and supplemental briefing regarding immigration policies, bias, and additional misconduct by the People. Finding Agustin's claims either forfeited or lacking merit, we affirm the judgment.

## II. BACKGROUND

On August 11, 2021, Agustin raped 12-year-old D. Agustin also touched D.'s breasts, inserted his fingers into her vagina, and forced D. to orally copulate him. D. told her parents the following day, leading to Agustin's arrest on August 13.

The San Diego County District Attorney's Office charged Agustin with three counts of aggravated sexual assault of a child (Pen. Code,[1] § 269, subd. (a); count 1: penis to vagina, count 2: penis to mouth, count 3: finger to vagina) and four counts of forcible lewd acts upon a child (§ 288, subd. (b)(1); count 4: penis to vagina, count 5: penis to mouth, count 6: hand to vagina, count 7: hand to breasts). The People alleged that the forcible lewd acts in counts 4–6 involved substantial sexual conduct. (§ 1203.066, subd. (a)(8).)

### 1. Pre-trial Motion Regarding Immigration Status

Prior to trial, and pursuant to defense counsel's request, the trial court authorized Agustin to question D. and her family at an Evidence Code

---

[1] All further undesignated statutory references are to the Penal Code.

section 402 hearing (402 hearing)[2] about U visas[3] being a potential motive to fabricate the allegations against Agustin. At that hearing, D.'s mother, Carolina, said she never discussed U visas with anyone. D.'s father, Jesus, stated that he was not aware of U visas prior to the incident with Agustin, he applied for a U visa for himself and his family about one week after the incident because he was informed that he could, and he told Carlonia about that U visa application. D. expressed confusion about the difference between U visas and regular visas, stating that prior to the incident, she was unaware that being the victim of a crime could help a person stay in the United States. The trial court then granted defense counsel's request to cross-examine Carolina and Jesus about U visas at trial.

2.    The People's Evidence

D. testified at Agustin's 2023 trial. She explained that Agustin was her neighbor in 2021, and that he helped her with her English. D. stated that on the morning of August 11, 2021, she awoke to Agustin inviting her to his

---

[2]    The purpose of a 402 hearing "is to decide preliminary questions of fact upon which the admissibility of evidence depends." (*People v. Superior Court* (*Blakely*) (1997) 60 Cal.App.4th 202, 209, fn. 6.)

[3]    U visas provide temporary immigration benefits to victims of specified crimes and their family if a law enforcement agency certifies the victim was helpful in the prosecution of the crime. (*Cazorla v. Koch Foods of Mississippi, L.L.C.* (5th Cir. 2016) 838 F.3d 540, 545.) We grant Agustin's request for judicial notice of five statutes relating to U visas and immigration (8 U.S.C. §§ 1325, 1182, 1101, 1227; Cal. Pen. Code § 679.10). (Evid. Code, § 451, subd. (a).) Agustin also requests judicial notice of two facts: "human beings are not automatically rational," and "incompetent human beings tend to inflate assessments of their own capabilities." We deny this request because Agustin has failed to show that these matters "cannot reasonably be the subject of dispute," or "are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subds. (g) & (h).)

3

house.  D.'s parents were at work and Agustin spoke to D. through the window next to D.'s bed.  D. went over to Agustin's house, believing he was going to help her with her English.

D. testified that her brother, J., came over to Agustin's house that morning looking for her.  J. then returned home after borrowing Agustin's Xbox, which D. helped J. carry.

D. told the jury that once back in Agustin's home, she and Agustin went into Agustin's bedroom, where Agustin pushed D. onto the bed, removed her clothes, and held her arms down over her head.  D. stated that Agustin touched D.'s breasts while she attempted to push him off with her feet and hands.  D. also explained how Agustin penetrated her vagina with his fingers and penis, after which Agustin grabbed her by the arm, pushed her onto her hands and knees on the floor, and forced her to orally copulate him.  After the abuse ended and when D. was leaving, Agustin told her that "no boy of [her] age was going to do it like that."

D. testified that she went home and showered that night, but she did not disclose the abuse because she was confused, scared, and Agustin told her not to tell anyone.  The following day, D.'s parents kept asking her if something happened because she was acting strange.  She initially invented a story that she had sex with a boy her age, but Carolina did not believe that because D. never left the house.  D. said her parents asked her about Agustin because Jesus watched their surveillance footage from August 11 and saw Agustin come over to their house.  D. then told her parents what happened, and Jesus called the police.

D.'s parents also testified at trial.  They both said that D. acted abnormally in the days following the incident, with Carolina reporting that she did not see D. shower during that time.  Carolina stated she was able to

4

get D. to disclose the abuse by telling her she had an upcoming medical appointment that would reveal any sexual activity.

Jesus testified that on August 12, he checked his home's surveillance footage from August 11 due to D.'s odd behavior. The footage depicted Agustin coming to their home and knocking on the window, causing Jesus to pressure D. to tell him what happened.

Thirteen separate clips from Jesus's surveillance footage were played for the jury. Those clips showed Carolina and Jesus leaving for work; Agustin approaching the window next to where D. slept; D. following Agustin towards his home; J. going toward Agustin's house and returning with D. and video game equipment; D. going back toward Agustin's home; D. returning to her home about 40 minutes later; Agustin leaving in his truck approximately 30 minutes later wearing different clothing than before; and Jesus arriving home from work.

Each of the clips played for the jury had date of "2019-01-01," but Jesus explained that date was an incorrect default date that he did not know how to change. Jesus also confirmed that the first two clips showing he and Carolina leave for work were from August 11. The remainder of the clips appear to be from the same date based on the timestamps and the settings depicted, but Jesus testified that the final clip, depicting him arriving home from work, was from a different day.

Jesus testified that he applied for U visas about one week after reporting Agustin's abuse of D., and that he discussed it with Carolina. Carolina stated that she did not recall any discussions after August 11 regarding visas for crime victims.

Forensic interviewer Christina Shultz, forensic nurse examiner Michelle Meyer, and detective Crystal Ventura also testified on behalf of the

People. All three recounted for the jury their August 13, 2021 interviews of D., which were largely consistent with D.'s trial testimony except that D. told the interviewers the abuse included anal sex. D. did not recall any anal penetration at trial.

Meyer conducted a sexual assault response team (SART) examination of D. on August 13, 2021. The exam revealed redness on D.'s hymen but no other injuries. Meyer acknowledged that the hymen injury could have been from something other than sex, but stated that SART exams commonly do not reveal any injuries. Dr. Nicole Ayson, a pediatrician and child abuse expert, confirmed that it is uncommon for an examiner to find physical injuries on a child who has been sexually assaulted. Dr. Ayson testified that D.'s hymen injury could have been from sex, and it was not present at D.'s follow-up examination on October 1, 2021.

Investigators did not find any semen on D.'s clothing nor Agustin's DNA on D.'s body. However, Meyer testified that D. reported showering and doing other daily hygiene activities after the assault that could have washed away evidence. Kelly Ledbetter, the criminalist who analyzed the evidence in this case, agreed that these activities can eliminate DNA. Dr. Ayson stated that the best chance to find DNA is within 24 hours of an assault, and D.'s SART exam was beyond that time frame. Detective Ventura also told the jury that the perpetrator's DNA is not always found in sexual assault cases.

3. Defense Evidence

Nurse practitioner Nicole Frankel testified on Agustin's behalf. She reviewed the report from D.'s SART exam and stated that the lack of more significant injuries is not conclusive but weighs in favor of there being no assault. Frankel stated that D.'s hymen injury could have been from anything that causes friction, such as tight clothing or excessive activity.

6

Frankel also opined that minors who are not sexually active or who have not started menstruating are at a higher risk of injury from sexual assault, and that women who menstruate heal much faster. This was inconsistent with Dr. Ayson's testimony, who stated that menstruation does not impact injuries, and that D. had already started menstruating.

Clinical psychologist Bruce Yanofsky also testified for the defense. Dr. Yanofsky evaluated Agustin in 2021, and his testing revealed that Agustin had no indication of sexual deviance, no commonality with known child molesters or rapists, and a normal sexual profile. Dr. Yanofksy concluded that Agustin did not appear to be sexually interested in children, teenagers, or forceful sexual activity.

### 4. Jury Verdicts

The jury found Agustin guilty of all seven counts, determining that counts 4–6 involved substantial sexual conduct. The trial court sentenced Agustin to 45 years to life in prison, consisting of three consecutive 15-year-to-life sentences for counts 1–3. The trial court imposed 8-year sentences for counts 4–7 but stayed them pursuant to section 654. Agustin appealed from the judgment.[4]

## III. DISCUSSION

### A. *Substantial Evidence Supports the Verdicts*

Agustin claims the verdicts were not supported by substantial evidence because D.'s testimony was inconsistent with her prior statements, D. and her family were not credible because they were interested in obtaining a U visa, and the jury could not use the absence of physical evidence as circumstantial evidence of guilt. We disagree.

---

[4] Agustin's notice of appeal was untimely, but this court granted him permission to proceed.

When a defendant challenges the sufficiency of the evidence supporting a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.)  We do " ' "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." ' " (*People v. Helzer* (2024) 15 Cal.5th 622, 646.)  " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

Here, D. testified at trial, providing a detailed firsthand account of Agustin's crimes.  D.'s testimony was corroborated by (1) her largely consistent statements to the forensic interviewer, the forensic nurse examiner, and a detective; (2) the surveillance footage from outside D.'s home; (3) D.'s parents' testimony regarding her disclosure of the abuse; the injury to D.'s hymen; Meyer and Dr. Ayson's testimony that the lack of other injuries is common; and Meyer, Dr. Ayson, Ledbetter, and Detective Ventura's testimony that the absence of Agustin's DNA was not unusual.  From this evidence, the jury could have reasonably concluded that Agustin was guilty of all seven counts.  (See, e.g., *People v. Elliott* (2012) 53 Cal.4th 535, 585 ["Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction."].)

Agustin is correct that D.'s trial testimony was not exactly consistent with her prior descriptions of the abuse, such as her inability to remember

previously disclosed anal penetration by Agustin. And perhaps D. and her family also could have been motivated to lie based on their U visa application. But these are matters of credibility the jury resolved in D.'s favor, and we do not reweigh that determination on appeal. Nor was the jury unreasonable here since most of the details in D.'s prior statements were consistent with her testimony, and the evidence revealed that D.'s family was not aware of U visas until after they already reported Agustin's crimes.

As for the absence of physical evidence, such as DNA, Agustin claims the jury could not use those facts as circumstantial evidence of guilt. He claims doing so would violate CALCRIM No. 224, which instructed the jury, "[i]f you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." But this was not a circumstantial evidence case. D.'s testimony was direct evidence of Agustin's guilt,[5] which the jury necessarily accepted as shown by its verdicts. Meyer, Dr. Ayson, Ledbetter, and Detective Ventura's testimony that the absence of physical evidence is common in assault cases merely corroborated D.'s testimony, and CALCRIM No. 224 is inapplicable "where circumstantial evidence is incidental to and corroborative of direct evidence." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171.)

Based on the foregoing we hold that substantial evidence supports the guilty verdicts.

---

[5]     " '[D]irect evidence' means evidence that directly proves a fact, without an inference or presumption." (Evid. Code, § 410.) Circumstantial evidence is " ' "that which is applied to the principal fact, indirectly, or through the medium of other facts, from which the principal fact is inferred." ' " (*People v. Smith* (2008) 168 Cal.App.4th 7, 14.)

## B. *Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel, a defendant must show (1) that counsel's representation " 'fell below an objective standard of reasonableness under prevailing professional norms,' " and (2) " 'resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

Agustin claims ineffective assistance of counsel on eight grounds.[6] We disagree with each.

First, Agustin claims his counsel failed to assist him in asserting his right to testify. Agustin claims his decision regarding testifying was unclear because his counsel asked him, "Are you going to testify? You've decided not to testify?" to which Agustin responded, "Yes." Although these questions were framed oppositely, the parties and the court proceeded with the understanding that Agustin would not testify, and there is no indication that Agustin disagreed with that outcome. Additionally, Agustin and his counsel had previously conferred off the record and Agustin confirmed that he had no questions about his right to testify. Thus, we see no demand to testify in the record, defeating any claim of error by defense counsel. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1053 [" 'When the record fails to disclose a timely and adequate demand to testify, "a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity." ' "].)

---

[6] Agustin cites 10 different instances, but three of them relate to defense counsel's alleged failure to address D. and her family's immigration status, and we address those three jointly.

Second, Agustin claims his trial counsel failed to introduce evidence of D. and her family's immigration status, abdicating Agustin's strongest argument—that D.'s family pressured her into accusing Agustin of abuse so they could obtain U visas.

At the 402 hearing, defense counsel questioned D. and her parents about U visas. The family's testimony reflected that none of them were aware of U visas prior to the rape, and that Jesus applied for a U visa approximately one week *after* he reported the crime. Defense counsel elicited similar testimony from Carolina and Jesus at trial. During closing argument, defense counsel argued that D. fabricated her accusations against Agustin to cover up an encounter she had with a boy, and that when her father subsequently applied for a U visa it created added pressure for her and prevented D. from telling the truth.

As can be seen, Defense counsel presented evidence of D. and her family's immigration status and argued the pending U visa application effected D.'s credibility. Agustin appears to believe that D.'s family had a preexisting knowledge about U visas and that their potential motive to lie should have been explored deeper. But that position is not supported by the record because the evidence indicates D.'s family was unaware of U visas prior to reporting Agustin's crimes to the police. Defense counsel's argument was reasonable considering that evidence, as well as D.'s testimony that she initially fabricated a story about a boy, and Carolina's testimony that she used an existing medical appointment to convince D. to disclose what happened. Under these circumstances, defense counsel's pursuit of the immigration issue did not fall below prevailing professional norms.

Third, Agustin claims "defense counsel failed to object to hearsay about underwear." Agustin fails to support this claim with a citation to the record

11

or argument. It is therefore waived. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286–287.)

Fourth, Agustin points to three questions the prosecutor asked that resulted in long responses to which defense counsel failed to object that those answers had become a narrative. One of the questions was to Carolina about D.'s behavior after the abuse, and the other two were to the forensic interviewer about her interview with D. But assuming narrative objections had been asserted and sustained, Augustin fails to show how the responses could not have been obtained through further questioning or that they were otherwise inadmissible. Augustin therefore fails to establish any prejudice.

Fifth, Augustin asserts that based on a confusing question by the prosecutor, it was unclear if Jesus testified that D. disclosed the abuse at 11 or 12 at night or if Jesus called the police at that time. In asserting defense counsel should have objected, Agustin merely claims the "question was confusing and added to the confusion of the jury about this matter about relevant issues to the case," without any further explanation. This imprecise assertion is insufficient to establish any prejudice.

Sixth, Agustin cites two instances where evidentiary arguments and rulings may have been made during unreported sidebar conferences, asserting defense counsel erred by not putting those matters on the record. Again, Agustin's conclusory claim that "[t]hese errors cumulatively prejudiced the defense" without any further elaboration falls short of the required prejudice showing.

Seventh, Agustin contends that defense counsel should have objected to the foundation of Jesus's surveillance footage because that footage indicated the wrong date. However, Jesus laid an adequate foundation by testifying that the videos had the default date ("2019-01-01") which he did not know

how to change, and that he obtained the footage from August 11, 2021, the day after it was recorded. Although Jesus testified that the final clip, which showed him arriving home from work, was not from August 11, that did not render the videos inadmissible for lack of foundation. In fact, evidence suggesting that the footage came from a different date could have helped Agustin's defense. We see no deficient performance by Agustin's attorney based on this ground.

Finally, Agustin argues defense counsel should have asserted a hearsay objection when D. testified that Agustin told her that she looked older than she was. Defense counsel had no basis to object because under Evidence Code section 1220, "[a] defendant's own hearsay statements are admissible." (*People v. Davis* (2005) 36 Cal.4th 510, 535.) Nor do we find the statement irrelevant, unduly prejudicial, or lacking in foundation as Agustin asserts.

In sum, Agustin has not demonstrated that he received ineffective assistance of counsel at trial and we reject the claim.

C. *Agustin Fails to Show the Trial Court Abused Its discretion in Imposing Consecutive Sentences for Counts 1–3*

A trial court has discretion to impose consecutive sentences for separate counts of aggravated sexual assault against a minor when the offenses involve the same victim and same occasion. (§§ 667.6, subd. (c), 269, subd. (a); *People v. Glass* (2004) 114 Cal.App.4th 1032, 1037.) Factors that support imposing consecutive sentences include the use of great violence, a vulnerable victim, and the defendant taking advantage of a position of trust. (Cal. Rules of Court, rules 4.421(a)(1), (3), (11), 4.425(b).)

" ' "[T]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to

13

achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376–377.)

In imposing consecutive sentences for counts 1–3, the trial court relied on the following aggravating circumstances: Agustin's use of violence, D.'s vulnerability, and Agustin's abuse of his position of trust. At one point when describing the violence, the trial court stated, "Agustin used force and violence to commit the acts upon D. He did disrobe her, he pushed her onto the bed, he put her into positions in different ways to effectuate the different, I guess, methods of sexual assault; and, as described by the victim, it was done with force. The phrase that she used is that Mr. Agustin described that he was '*going to show her what no boy her age could show her*.' The court finds that to being an aggravating circumstance."

Seizing on the language italicized in the previous paragraph, Agustin argues that the trial court erred because that statement was misquoted and lacked foundation and evidentiary support. Reading the ruling as a whole, the statement attributed to Agustin does not appear to be an independent basis for the trial court's decision, but rather background information regarding the violence Agustin employed. In any event, Agustin does not challenge the trial court's findings regarding D.'s vulnerability, Agustin's use of violence, and his abuse of trust. These are all valid grounds to impose consecutive sentences (Cal. Rules of Court, rules 4.425(b), 4.421(a)(1), (3),

14

(11)), and we see no abuse of discretion here.  Agustin therefore fails to carry his burden in demonstrating error.[7]

D.      *Agustin Forfeited His Claim of Judicial Bias*

Agustin seeks reversal based on judicial bias.  He claims the trial judge "made several decisions and rulings from an implicit bias in favor of sex crime victims, and against learning about or knowing about the plight of immigrants."

Agustin forfeited his claim of judicial bias because he never objected on that ground in the trial court, nor did he seek to disqualify the trial judge.  "A defendant may not go to trial before a judge, betting on a favorable result and failing to raise objections of bias, and then argue on appeal that the judge was biased." (*People v. Johnson* (2018) 6 Cal.5th 541, 592.)  "We likewise note that defendant's willingness to let the entire trial pass without articulating an appropriate objection 'strongly suggests' his claim is without merit." (*Ibid.*)

E.      *Agustin Forfeited His Claims of Prosecutorial Misconduct*

Agustin asserts the prosecutor engaged in various instances of misconduct throughout his trial.  However, Agustin forfeited these claims by failing to assert them in the trial court. (*People v. Fayed* (2020) 9 Cal.5th 147, 204 ["To preserve a claim of prosecutorial misconduct on appeal, ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety." ' "].)

---

7      Agustin also briefly asserts that his sentence was cruel and unusual under the state and federal Constitutions.  This claim is forfeited because it was not raised in the trial court (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247), and it is deemed without foundation based on the lack of substantive argument and supporting authority (*People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303).

Agustin argues his failure to object should be excused because doing so would have been futile.  While futility is a recognized exception, it applies in narrow circumstances.  (*People v. Hill* (1998) 17 Cal.4th 800, 820–822 [prosecutor's "continual misconduct" and trial court's repeated dismissal and criticism of defense counsel's objections created "poisonous" atmosphere allowing counsel to forego further objection]; *People v. Riel* (2000) 22 Cal.4th 1153, 1213 ["normal rule requiring an objection applies" except in "extreme circumstances" such as those in *Hill*].)

This case presents no unusual circumstances.  Many of Agustin's assertions of futility are conclusory and therefore unpersuasive.  (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 51 [finding "conclusory assertion . . . insufficient to avoid waiver"].)  Agustin also relies on the trial court's denial of other defense objections, but "[w]e cannot presume that, because the court denied some other objections made on different grounds, it would necessarily have denied the specific objection at issue here." (*People v. Homick* (2012) 55 Cal.4th 816, 859.)  Finally, we see no "poisonous" atmosphere nor "continual misconduct" by the prosecutor.  (*People v. Hill*, *supra*, 17 Cal.4th at p. 821.)  The trial court never criticized Agustin's objections and sustained many of them, and defense counsel commented near the end of trial that he and the prosecutor "work very well together."

Accordingly, Agustin has not shown that asserting prosecutorial misconduct objections in the trial court would have been futile, and he has forfeited those claims on appeal.

F.    *Agustin's Reply and Supplemental Briefing Do Not Show Reversible Error*

After briefing in this matter was completed, this court granted Agustin's request to file a supplemental brief.  In his supplemental briefing,

16

as well as his initial reply brief, Agustin raises several additional claims. As we explain, none of these claims warrant reversal.

First, many of Agustin's claims are based on President Trump's immigration practices occurring after Agustin's trial, which Agustin attempts to establish by citing various recent publications.[8] Agustin claims that he is now at risk of "being disappeared" to some "foreign black site," and his trial counsel was unable to advise him of that potential immigration consequence.[9] However, " ' "an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration." ' " (*People v. Mataele* (2022) 13 Cal.5th 372, 423, fn. 9.) As such, the current President's posttrial immigration practices are not an adequate basis to reverse the judgment on direct appeal.

Second, Agustin challenges the U visa program, requesting that we declare California's participation in it unconstitutional  Agustin claims U visas do not serve victims' interests, subject victims to potential deportation, and encourage victims to turn on other immigrants. He further contends California's "immigrant blind criminal system" prevents lawyers from adequately addressing immigration related issues.

California's participation in the U visa program existed at the time of Agustin's trial, and its only relevance to this case is the effect it had on D. and her family's credibility. As discussed above, that credibility issue was adequately addressed at trial based on the available evidence.

As for California's allegedly "immigration blind criminal system," Agustin cites section 679.10 and Evidence Code section 351.4. Section 679.10

---

8    Agustin's reply and supplemental briefing do not contain a single citation to the trial court record.

9    Agustin is from Guatemala, but his immigration status is unclear.

implements the U visa program in California and allows disclosure of a participating victim's immigration status "to comply with . . . legal process, or if authorized by the victim or person requesting the" U visa. (§ 679.10, subd. (m).) Evidence Code section 351.4 states, "[i]n a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or their attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status." (Evid. Code, § 351.4, subd. (a).)

Contrary to Agustin's claims, section 679.10 and Evidence Code section 351.4 illustrate that California limits, but does not absolutely bar, evidence regarding immigration status. Consistent with those sections, defense counsel elicited evidence regarding D. and her family's immigration status during trial, demonstrating that neither California's criminal system, nor Agustin's trial were "immigration blind."

For these reasons, Agustin's challenges to the U visa program and California's limits on immigration evidence do not provide a basis for reversing the judgment.

Third, Agustin claims that Respondent mischaracterized the law and misrepresented evidence in its initial brief and the prosecutor committed a *Brady* violation[10] by failing to disclose D.'s immigration status. We see no misrepresentations of law or fact in Respondent's briefing. Further, Agustin

_____

[10] " '[T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence . . . although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042–1043.)

fails to support the alleged *Brady* violation with a record citation demonstrating the prosecutor had prior knowledge of D.'s immigration status, and any failure to disclose did not prejudice Agustin because he explored that issue at the 402 hearing.

Finally, Agustin argues the trial court failed to instruct the jury regarding implicit bias. Agustin does not cite, nor are we aware of, any authority mandating the trial court to instruct the jury on implicit bias. Agustin therefore forfeited the issue on appeal by failing to request implicit bias jury instructions during trial. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001.)

## IV. DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

IRION, Acting P. J.

DO, J.

19